## CHIMENE v. DOW.

### The MABEL LEE.

### No. 972.

United States District Court
S. D. Texas, Houston Division.

March 27, 1952.

Fulbright, Crooker, Freeman & Bates (Sweeney J. Doehring), of Houston, Tex., for libellant.

Masterson, Williams & Smith (Fred L. Williams, Jr.), of Angleton, Tex., for respondent.

KENNERLY, Chief Judge.

On the evening of July 5, 1948, Libellant Calvin A. Chimene, then about 20 years of age, and three of his friends—George Willis, George Krohm, and Edward W. Stuebing—about the same age, went fishing for flounders, called floundering, in Galveston Bay off the mouth of Clear Creek, in this District and Division. They went from Dolney's Place on Clear Creek to the floundering grounds in Galveston Bay in a 15-foot row boat or skiff, which they hired from Dolney, and which they propelled by an out-board motor belonging to the father of Willis. Having been unsuccessful in floundering, they decided to return to land, and while they were on their way back in the row boat, it was in a collision with the Mabel Lee, a 17-foot, 115 H. P., motor boat with a 6-foot beam, owned and operated by Respondent John Dow, a young man of approximately the same age as the other four. Libellant Calvin A. Chimene was injured, and brings this suit in admiralty against John Dow, the owner of the Mabel Lee, for damages for such injuries.

Libellant charges Respondent with negligence, which Respondent denies. Respondent charges Libellant with negligence, which Libellant denies.

The facts are substantially as follows:

(a) The plats in evidence pretty well show the location and situation of the waters in which the boats were being navigated at the time of the collision, but the following may help.

Clear Creek is between the area known as Kemah and the area known as Seabrook. Such Creek is crossed by two bridges—the

Southern Pacific Railway Company Bridge and the Highway Bridge. There is a deep water Channel from the vicinity of the two bridges in an easterly direction along and through Clear Creek to Galveston Bay and thence in a northerly direction around a point of land to the Seabrook area and beyond. This is a well defined Channel, approximately ——— feet deep and 75 to 100 yards wide. For convenience, it will be called Clear Creek-Seabrook Channel.

From about the point where this channel turns in a northerly direction towards Seabrook, there is a short, small, and marked channel running in an easterly direction out into Galveston Bay—this for convenience will be called Bay Channel. Alexander Dolney's Place, called for convenience Dolney's Place, where Libellant and his friends hired the row boat, is on Clear Creek not far from the two bridges. Muecke's Place, which will be referred to, is in the vicinity of Seabrook and on the Clear Creek-Seabrook Channel. Oyster Shack, which will be referred to, is on the Kemah side of Clear Creek and is on the Clear Creek-Seabrook Channel.

(b) On the afternoon of July 5, 1948, Libellant Calvin A. Chimene and his three friends—George Willis, George Krohm, and Edward W. Stuebing—all of whom lived in Houston, decided to go floundering in Galveston Bay off the mouth of Clear Creek. While there was no specific agreement among them, there was a tacit agreement that each would contribute something towards what was needed for the trip. Libellant's contribution was the use of his father's car and the furnishing of gasoline therefor, in which car all four of them rode from Houston to the place of Alexander Dolney, who rented row boats, on Clear Creek. On the way from Houston to Dolney's Place, certain things were purchased and paid for by George Krohm, to be used as food and in preparing the flounders for eating. Arriving at Dolney's Place, Edward W. Stuebing, acting for himself and the other three young men, rented the row boat and paid the charge therefor. The row boat contained oars which were ordinarily used, but for this trip, an out-board motor belonging to George Willis' father was attached to the row boat to propel it. Willis also furnished a Coleman lantern, which is regarded as standard for floundering, and also a flashlight. Both to be and were used in floundering. Willis also supplied some other fishing equipment.

(c) Leaving the car of Libellant's father parked near Dolney's Place, the four young men about dark on July 5, 1948, embarked in the row boat and went in an easterly direction along the Clear Creek-Seabrook Channel, thence into the Bay Channel, and thence in a southerly direction to the floundering grounds. To reach the floundering grounds, it was necessary, in crossing a reef or some shallow water, for one or more of them to get out and wade and push the row boat. There were no lights of any kind belonging to or attached to the row boat and on this trip to the floundering grounds, they used the Coleman lantern and the flashlight in navigating the row boat.

(d) While floundering, they had trouble with the Coleman lantern, and being unable to locate any flounders, they decided to return to land. They returned substantially over the same route they had come. It was then somewhere between 9:30 and 11:00 o'clock at night, no moon, but not very dark. They began and continued the return trip with Willis in the stern of the row boat, operating the out-board motor and facing the direction in which they were going. George Krohm was sitting or lying down in the bow of the boat with his face in the direction in which they were going. Edward W. Stuebing was seated just ahead of Willis, and facing the stern. Libellant Calvin A. Chimene was seated about midship and likewise facing the stern. As stated, the row boat had no lights of any kind thereon and they began the return trip with the Coleman lantern and the flashlight as their only lights. After going a short distance and before the collision with the Mabel Lee occurred, the Coleman lantern burned out, leaving them with only the flashlight which was in the hands of Willis in the stern of the row boat.

(e) Krohm was I think keeping a lookout ahead, as was Willis. Stuebing was not

keeping a lookout at all in any direction, but was at the time of the collision engaged in putting on his shoes. Whatever lookout, if any at all, Libellant Calvin A. Chimene was keeping was in the direction of the stern of the row boat. Considering that they had only a flashlight, and that it was night, and that their row boat stood only about two feet above the water, the lookout that these four kept was wholly inadequate. They knew that the row boat was difficult to see in the water and that their only safety was in their keeping a lookout and seeing other boats and keeping out of their way, yet they were apparently carefree. This was particularly true of Libellant and Stuebing.

(f) While thus proceeding with only the flashlight handled by Willis and with a free-board of only about a foot in the center of the row boat, the four young men discovered the Mabel Lee to their port bow, apparently coming directly towards them. Someone of the four cried out a call of danger, and all four of them forthwith jumped overboard into the water. The Mabel Lee struck the row boat, injuring it and as stated injuring Libellant.

(g) There was evidence as to the movements of Respondent John Dow during the entire day of July 5, 1948, but it seems only necessary to say that during the afternoon of that day, Respondent navigated the Mabel Lee from a point west of the Southern Pacific Railway Company Bridge in Clear Creek, where it was customarily kept, to Muecke's place on the Clear Creek-Seabrook Channel near Seabrook. After spending some time there, Respondent about 9:30 P.M., with the witness E. A. Parks aboard, navigated the Mabel Lee to the Oyster Shack, a cafe at Kemah on the south side of the Clear Creek-Seabrook Channel, in order to make a long distance telephone call to Houston. After completing the call, Respondent and Parks again went aboard the Mabel Lee to return to Muecke's Place. While on their way, they discovered some object low in the water, which turned out to be such row boat. The collision then occurred. The Mabel Lee was immediately slowed down and circled back to the point of collision, and all four of the young men, including Libellant, who was injured, were helped onto the Mabel Lee and carried back to Dolney's Place.

(h) The acts of negligence alleged by Libellant against Respondent are as follows:

"1. The Mabel Lee was unseaworthy and improperly manned, equipped and supplied.

"2. She was not in charge of a competent person or persons.

"3. She and the respondent failed to keep a proper, attentive and good lookout.

"4. Respondent was causing her to proceed at a reckless rate of speed under the circumstances.

"5. Respondent failed and neglected to cause said Mabel Lee to display any lights in violation of the Inland Rules.

"6. Respondent failed and neglected to cause the Mabel Lee to hold to her starboard side of the channel.

"7. Respondent failed and neglected to cause the Mabel Lee to hold to that part of the channel which lay to her starboard hand side.

"8. Respondent failed and neglected to signal the course and intentions of said Mabel Lee.

"9. Respondent permitted and caused the Mabel Lee to cross the line of traffic of one channel and to turn into another channel without taking avoiding action as to boats proceeding or likely to be proceeding in the first channel.

"10. Respondent failed and neglected to timely and properly maneuver the engine and helm of the Mabel Lee so as to avoid collision.

"11. Respondent failed and neglected to slow, stop, or stop and reverse the Mabel Lee's engines seasonably.

"12. Respondent failed and neglected to drop an anchor or anchors on said Mabel Lee.

"13. When danger of collision was or should have been apparent, respondent failed and neglected to take proper or timely precautions to avoid it.

"14. Respondent permitted and caused the Mabel Lee to collide with the skiff in which libelant was riding and with the libelant.

"15. Respondent failed and neglected to stop the engines and propeller of the Mabel Lee after libelant was known or should have been known to the respondent to be in the water.

"16. Respondent permitted and caused the propeller of the Mabel Lee to strike, chew up and mangle the libelant.

"17. Upon information and belief, respondent was, prior to and at the time of the collision, under the influence of intoxicating liquor."

I find in favor of Respondent and against Libellant on all these claims of negligence. I find that the Mabel Lee was seaworthy and was properly manned, equipped, and supplied. She was in charge of a competent person, to-wit, Respondent John Dow, and Dow and also Parks, who was riding with him, were keeping a proper and attentive and good lookout at and before the time of the collision. The Mabel Lee was, at the time of and before the collision, displaying her red and white lights on her bow, and a white light on her stern. I find no fault with Respondent with respect to the maneuvering and handling of the Mabel Lee before and at the time of the collision. After discovering something in the water, which turned out to be the row boat, it was impossible to avoid striking it. Neither Respondent John Dow nor Parks, who was on the Mabel Lee with him, was in any way intoxicated.

The evidence naturally doesn't point out the exact spot where the collision occurred, but I think and find that it occurred about the time the row boat with its four occupants, moving westward, came out of the Bay Channel and entered the Clear Creek-Seabrook Channel. It was at night and difficult for the occupants of both boats to determine their exact location, but I think it is reasonable to find and I do find that the Mabel Lee, moving northward, was on the proper side—starboard side—of the Clear Creek-Seabrook Channel between the Oyster Shack and Muecke's. And that the row boat, moving westward and going in the direction of Dolney's Place on Clear Creek was properly on the starboard side of such Channel. In other words, I do not think there was negligence on the part of either the row boat or the Mabel Lee with respect to their positions at the time of the collision.

There is no Law, Statute, or Regulation fixing the speed of vessels on the Clear Creek-Seabrook Channel or the area thereof, and I find that the Mabel Lee was not being navigated at a negligent or dangerous speed before and at the time of the collision.

The four occupants of the row boat all testified, I believe, that the Mabel Lee was traveling at a high rate of speed. I think, however, that the short glimpse that they had of the Mabel Lee before they jumped from the row boat does not enable them to give dependable evidence as to the speed of the Mabel Lee, nor as to its lights. The witness Parks, who was not engaged or interested in the operation of either vessel, appeared from the witness stand to be more or less unfavorable to speeders. He says that the Mabel Lee was being driven too fast, but he also says that no matter at what speed she was driven, it would be impossible to have avoided striking the row boat after the row boat was discovered by John Dow or himself who were on the Mabel Lee. In other words, he was positive that if the Mabel Lee had been moving at all, she would have struck the row boat.

I think that Respondent John Dow's testimony that the Mabel Lee was traveling about 17 or 18 miles per hour is correct. I do not find that speed to have been negligence nor to have been the proximate cause of the collision.

(i) Calling the row boat a skiff, Respondent alleges that such row boat, those

in charge of her, and Libellant were negligent in the following particulars:

"1. Said skiff was not in charge of a competent person.

"2. Said skiff, and the occupants thereof, were not keeping a proper lookout for the Respondent's boat or for other boats reasonably likely to be present in the channel.

"3. The said skiff was not equipped with nor was it displaying proper running lights as required by the provisions of the Motor Boat Act of 1940, Title 46, Chapter 16, Sub-chapter 2, Articles 526, 526a and 526b, United States Code Annotated, nor as required by the rules and regulations of the United States Coast Guard.

"4. The said skiff was not equipped with the life saving and accident prevention equipment required by Article 526b of Title 46 of the United States Code Annotated and as required by the rules and regulations of the United States Coast Guard.

"5. The occupants, and each of them, of the skiff failed to give proper warning of its presence or approach.

"6. The said skiff was traveling at a speed which, under the circumstances, was dangerous to the occupants of said skiff and to the occupants of other boats reasonably likely to be present in said channel.

"7. The said skiff was proceeding from an area in which there was no channel or customary passage or use and very little traffic into a recognized, well defined and heavily traveled channel and was crossing the stream of traffic in said channel without waiting for the traffic in the main channel to pass; without signaling her intention to cross said channel; and without giving notice of her presence in said channel.

"8. The said skiff did not employ any change of course or other action to avoid the collision.

"9. The occupants of said skiff failed and neglected to signal the course and intentions of said skiff."

These charges of negligence are well established by the evidence. I think it perfectly clear that it was negligence for Libellant and his three friends to be in these waters at night, in a row boat running low in the water, without lights and depending only on a flashlight in the hands of one of them to warn operators of other boats of their presence there. Then too I think that, as stated, all of them, and particularly Libellant and Stuebing, were negligent in not keeping the proper lookout and in not undertaking to give and giving proper warning of the presence of the row boat in such waters. I think there can be no escape from this.

(j) That Libellant was seriously injured in the collision, and insofar as his right leg is concerned permanently injured, is well established. Also that he had much pain and suffering and incurred much hospital, nursing, and medical expenses is fully shown. I find his damages for all to have been $12,000.

1:—I conclude that Respondent was not negligent, and that Libellant was negligent, and that, therefore, Libellant may not recover damages from Respondent.

2:—I think Libellant and his three friends were engaged in a joint enterprise or venture, and that the negligence of one was the negligence of Libellant, but be that as it may, Libellant himself was individually guilty of negligence which was the proximate cause of the collision.

From what has been said, it follows that Judgment should be and will go for Respondent.

Let appropriate Decree be drawn and presented.