Betty E. DOTY, etc., et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Nos. 79 C 2581, 79 C 2589.

United States District Court, N. D. Illinois, E. D.

Feb. 2, 1982.

Louis G. Davidson, Louis G. Davidson & Associates, Robert B. Patterson, Pignatelli, Pignatelli & Ripley, Chicago, Ill., for plaintiffs Doty and Winters.

Bernard R. Nevoral, James A. Corrigan, Nevoral & Corrigan, Chicago, Ill., for plaintiff Kohl.

David V. Hutchinson, Dept. of Justice, Washington, D. C., Daniel C. Murray, Robert B. Breisblatt, Asst. U. S. Attys., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

These consolidated actions were brought by three widows, individually and as Special Administrators of the Estates of their respective husbands (Charles Doty, "Doty"; Terry Winters, "Winters"; and Thomas Schlatter, "Schlatter";[1] collectively "decedents") who lost their lives in a boating accident on the Mississippi River June 22, 1977. That accident occurred when Schlatter's boat, from which all three decedents were fishing, capsized in Gate 6[2] below Lock and Dam 13 near Fulton, Illinois.

Although this is only a summary, essentially the parties' contentions are these:

(1) Plaintiffs assert that the United States, acting through its agency the Corps' Rock Island District, negligently failed to give decedents adequate warning of the hazardous conditions of the waters below Lock and Dam 13 (throughout these Findings and Conclusions the term "below" is used with the common meaning "downstream of"), failed to enforce the 100 foot restricted zone below

1. Originally Schlatter's Estate was named as a co-defendant in the Doty-Winters action. That claim has been dismissed voluntarily, so that only the United States and its Army Corps of Engineers (the "Corps") are defendants.

2. Footnote 3 and Finding of Fact ("Finding") 1 explain the system of gates and their numbering.

the dam, and intentionally opened a gate on decedents.

(2) Defendants' position is that the accident was caused solely by the decedents' acts in failing (a) to heed the "Restricted" sign located directly above where decedents tied their boat, (b) to avoid the open and obvious hazards of the seething, boiling and turbulent water in the vicinity of Gate 6 and (c) to wear life-jackets while fishing in an obviously dangerous area.

This action has been tried without a jury upon the facts as to defendants' claimed liability. After considering all the evidence and arguments of counsel, in accordance with Fed.R.Civ.P. 52(a) the Court finds the facts and states its conclusions of law as follows:

### Findings of Fact ("Findings")

1. On June 22, 1977 decedents drowned while fishing from a boat owned by Schlatter, which they had tied to Pier 6 [3] on the downstream side of Lock and Dam 13 on the Mississippi River near Fulton, Illinois. Schlatter's boat was a 16-foot Glastron T-161 Bass Boat powered by a 70 horsepower Johnson outboard motor. After the drowning it was found capsized below Gate 6.

2. Lock and Dam 13 was built by the Corps in 1936–38 for navigational and flood control purposes. It is one of 29 lock and dam facilities constructed on the Mississippi River to provide a 9-foot deep channel for navigation. It has been owned, operated, controlled and supervised by the Rock Island District of the Corps' North Central Division continuously to and since June 22, 1977.

3. Lock and Dam 13 extends from the Illinois riverbank (near Fulton) across the river to the Iowa riverbank (near Clinton). It comprises (east to west) one operating lock chamber on the Illinois side, an auxiliary lock area that has never been completely constructed (so that its gates are continuously closed) and thirteen movable steel gates that control the river's flow. Those enormous gates are separated by concrete supports ("piers"). They and the piers span 1066 feet across the Mississippi, and the gates rise high above the water's surface. They are of two types:

(a) three larger "roller gates" (Gates 5, 6 and 7) are located approximately at the center of the river, and

(b) ten smaller "tainter gates" are located on either side of the roller gates—four (Gates 1 through 4) to the east and six (Gates 8 through 13) to the west.

4. Both the tainter and roller gates are adjustable to varying heights, allowing varying amounts of water to flow through. Controls for each roller gate are separate and are located in pier houses on top of the dam. By adjusting the gate settings at the 29 dams on the Mississippi, the Corps maintains the 9-foot navigation channel. Each dam regulates the level of the water upstream of its gates (the "pool") but not the depth of the waters immediately downstream (the "tail water").

5. Piers on either side of each roller gate extend downstream from the dam. Ladder rungs are built into the downstream face of the piers (the "bullnose" or "piernose") for maintenance purposes. It is about 40 feet from the piernose to the roller gate.

6. Both the gates and the piers are built on a concrete foundation (the "sill"). Another integral part of the sill are baffle blocks, obstructions constructed to break the water's flow immediately below the dam. That dissipates the water energy, preventing erosion downstream.

7. Such dissipation of water energy is partly visible in the form of surface turbulence ("white water" or "seething boils") downstream from the dam. That turbulence varies in its intensity and visibility depending upon a number of conditions, including the gate settings, volume, flow rate and height of water ("head") in the upstream pool. On the downstream side of the dam a visible "breakline" runs more or less parallel to the dam on the water's sur-

---

**3.** Numbering of the piers (like that of the gates they separate) runs from east (the Illinois side of the river) to west (the Iowa side). Gate 6 is immediately west of Pier 6.

face. Its location varies from time to time depending on the same factors. Upstream of the breakline the current flows back toward the dam, while downstream of the breakline the current flows downstream. One can see logs and debris held up against the gates by the upstream current on the upstream side of the breakline. Anyone who attempted to fish near the breakline could observe the direction of the current as it carried his fishing line either upstream or downstream.

8. Dissipation of water energy by the baffle blocks is also partly subsurface and not visible to boaters on the surface of the water. Such subsurface turbulence is also directly related to the factors referred to in Finding 7.

9. Many people boat and fish in the Mississippi River, including the waters near Lock and Dam 13. Such people and other members of the public are advised by federal regulation, as well as by signs and lights posted on Lock and Dam 13 itself (see Finding 10), that boating is not permitted 600 feet immediately upstream from the dam and 100 feet immediately below the dam. Those waters have been designated as "restricted" by the Rock Island District, pursuant to its authority and discretion as provided in 33 C.F.R. § 207.300(s).

10. From 1968 through the time of decedents' accident and thereafter the 100-foot "restricted" area below Dam 13 was clearly marked with the following signs and lights:

(a) There has been a sign 8 feet wide by 5 feet high posted below the dam on the "intermediate wall" (the wall on the west side of the lock, which separates the lock chamber abutting the Illinois shore from the river). Printed in black letters on the sign's yellow enamel background is the legend:

RESTRICTED. KEEP BELOW THIS POINT.

That sign faces the river and is clearly legible from the waters immediately below the center of the dam.

(b) Above the sign described in Finding 10(a) is a constantly-lit red warning light positioned on the intermediate wall. That light is aligned with two flashing red lights positioned on a mast on the land wall of the lock (the wall on the east side of the lock, which separates the lock chamber from the Illinois shore). When a boater is 100 feet below any part of the dam, he is able to see the three red lights aligned with one another, while any other position (either less or more than 100 feet below the dam) destroys that visual alignment from a straight vertical line.

(c) There is a constantly-lit yellow caution light positioned on the intermediate wall 300 feet below the dam. It is aligned with two flashing yellow lights on the land wall. Alignment works the same way as with the red lights described in Finding 10(b).

(d) On the downstream face of the river wall next to Gate 1 (the tainter gate nearest the Illinois shore) is a red, black and white sign, 20 inches by 28 inches, whose upper portion has an oval in which there is printed the word "DANGER" and whose lower portion says "KEEP 100 FEET FROM DAM."

(e) Another danger sign of the same size, colors and configuration is posted on the downstream face of the concrete support between Gates 12 and 13 (the tainter gates nearest the Iowa shore). Its lower portion says "KEEP 300 FEET FROM DAM," reflecting the restricted area in effect before 1968.

(f) At two different places across the top of the dam facing downstream, the word RESTRICTED is painted in red letters that can be seen from the river more than 300 feet below the dam.

(g) Covering the full width of the downstream face of Pier 6—the very pier where decedents' boat was moored—is a yellow enamel sign with black letters. Before 1968 that sign had read "RESTRICTED. KEEP 300 FEET FROM DAM." When in 1968 the "restricted" area below the dam had been diminished from 300 to 100 feet the "3" had been painted over with white paint and apparently a "1" had been painted in

instead. It is not clear from the record exactly what the condition of the sign was at the time of the accident (photographs included among the trial exhibits were all taken some years later). But if the evidence is taken in the light most favorable to decedents, the sign would have read at the time of the accident (with the dash indicating a white-painted space on the yellow sign):

RESTRICTED. KEEP –00 FEET FROM DAM.

In the photographs taken well after the accident, as the observer gets closer to the dam the white paint covering the black "3" appears as a partial covering of the "3" (which can be perceived through the paint). That sign must fairly be read as putting decedents on notice of (1) a prohibition against approaching the dam and (2) a distance specification that cannot be zero feet, hence must be at least 100 feet. At a minimum the sign obligated decedents to look about them for some clarification of the arguably ambiguous prohibition, and had they done so the numerous other signs and lights identified in this Finding 10 would have plainly and unambiguously apprised them of the 100-foot downstream prohibition.

11. In 1966 and 1967 the various signs had been changed by substituting the word "RESTRICTED" for the previously-used word "DANGER." Every witness who was asked the question what "RESTRICTED" meant (except plaintiffs' expert witness Dr. Caskey, who hedged on the issue—to his discredit—and whose testimony on this subject is not credited by the Court [4]) testified that it meant "stay out" and was a *prohibition* rather than simply a warning of danger. Those witnesses included fishermen, all of whom understood that "RESTRICTED," certainly when coupled with a direction to keep a distance from the dam or to keep below a specified point, meant an absolute prohibition against coming closer to the dam than that distance or that point. Dr. Caskey's testimony to the effect that such a warning, to be effective, must also include a specification of the *reason* for the prohibition is rejected. Decedents were bound to comply with the restriction—that is, the prohibition—imposed by the congeries of signs and lights referred to in Finding 10.

12. Both the reasonableness and effectiveness of the signs referred to in Finding 10 and the clarity of their meaning as stated in Finding 11 were confirmed by the testimony of a number of witnesses. One of them, Raymond Wainscott ("Wainscott"), had been fishing with Schlatter two or three weeks before the accident. At that time Wainscott observed the sign on Pier 6 (Finding 10(g))—the very pier to which decedents tied up the date of the accident—and understood it to mean to stay away so many feet downstream from the dam; and he also saw the sign on the intermediate wall (Finding 10(a)) and understood it to mean not to go past that line toward the dam. Plaintiffs will not be heard to contend that decedents could be blind to the same knowledge of the existence and significance of the signs.

---

4. Dr. Caskey testified that "restricted" meant "keep off" or "don't go on," as though the various signs were prohibitions against going physically *onto* the dam. If the sign referred to in Finding 10(g) were read with either "100" or "300" in the blank space below:

RESTRICTED. KEEP      FEET FROM DAM.

Dr. Caskey's suggested reading would be patently absurd (and he effectively acknowledged that on cross-examination). Even if (as plaintiffs contend) the whiting out of the first digit and later erosion of the painted-over numeral "1" had left the sign "00" Dr. Caskey's version would still be untenable. "From dam" means a *distance* away from the dam, as Dr. Caskey also acknowledged on cross-examination. No one intending to prohibit physical entry onto a dam would try to accomplish that purpose by posting a sign reading "Keep 00 feet from dam" instead of simply "Keep off dam." When expert witnesses are so openly willing to bend their testimony to fit a party's theories, they cast the rest of their testimony into question. For this reason and for other reasons expressed in these Findings, Dr. Caskey's testimony is entitled to and has been given little or no weight.

13. Plaintiffs assert that defendants should have taken additional measures to warn the public of the dangers involved in approaching too close to the dam, including for example the establishment of buoy barricades. In the latter respect the Corps had specifically considered that possibility for several years, but an experiment at Lock and Dam 12 about two or three years before the accident showed that buoy devices downstream of the dam would not have been feasible, because the changing heights of the tail water and the turbulence and cause of the flow prevented the buoys from holding their position (testimony of Supervisory Civil Engineer Richard Sharp of the Corps). Moreover, the physical configuration of the dam and the walkway atop the dam would permit lines and warning blocks to be suspended from the upstream side of the dam, but *not* the downstream side. But in any case hindsight would *always* indicate that one more safety precaution could have been taken (else no accident could ever occur), and the controlling fact here is that the warning measures in fact employed by defendants were in fact reasonable, and the Court so finds.

14. Both plaintiffs and defendants introduced evidence of Corps publications (films, pamphlets and news releases and Mississippi River charts) warning of risks in the neighborhood of locks and dams. There was no direct evidence that any of the decedents was aware of such materials, although Schlatter may have had the opportunity to have become so (before the accident he had visited Lock and Dam 13 on occasion and had shown his sons the locking facility, where pamphlets were available). Accordingly such evidence bears only on defendants' awareness of the dangers of boating in close proximity to Lock and Dam 13 (an admitted matter) and the reasonableness of their efforts to apprise the public of such dangers. In the latter respect the matters referred to in Findings 10 to 12 have far greater significance and are controlling for purposes of this case.

15. There was a conflict in the testimony as to the frequency with which fishermen went within the 100-foot "restricted"

area in violation of the regulations and in disregard of the warnings identified in Finding 10. Government personnel were aware that took place with at least some frequency (for example Lockmaster Glenn Wonders, with more than 15 years' experience at Lock and Dam 13 before the accident, testified that had happened "very infrequently"). There was however no evidence that any Corps personnel had observed any instance in which *anyone* tied up directly to the pier as decedents did, or any instance in which *anyone* ever came as close to the roller gates as decedents were before the accident. Indeed the only testimony of any witness as to seeing boats tying up directly to the dam at any of the gates was by persons directly connected with Schlatter and involved in such activity with Schlatter himself: Schlatter's son Gregory and his best friend George Crabb ("Crabb") and perhaps his father-in-law Paul Gastineau ("Gastineau").

16. Corps employees at the dam are lockmen whose job involves the operations and maintenance of the lock and dam. They are not law enforcement officers, have no citation authority and are not required by the terms of their employment to keep boaters from the dam. If however a lockman saw a boat inside the restricted area, particularly if it appeared to be close to the dam, it was the practice to go out and warn boaters. Both the lockmen on duty at the time of the accident, Leonard Hebeler ("Hebeler") and Wendell Zipse ("Zipse"), testified they did not see decedents before the accident. Plaintiffs contend that Hebeler and Zipse must necessarily have seen decedents, but the Court does not so find, and it finds Hebeler's and Zipse's testimony credible in that respect.

17. There have been other boating accidents, including fatalities, near other locks and dams on the Mississippi River before the accident involved in this action. There had been a fatal accident involving a boater *above* Lock and Dam 12 about one year before decedents' accident (substantially greater risks are attendant upon boating above a dam than below it, as confirmed by

the fact that the restricted area is 600 feet immediately upstream of locks and dams and 100 feet immediately downstream). Before decedents' accident no boater had ever drowned or been injured in the waters below Lock and Dam 13.

18. Testimony of several fishermen who were in the area the date of the accident reflected an attitude that some risks were worth taking where the fishing was especially good. However, none of those fishermen or any other fishermen who testified would have taken a boat as close into the dam and tied up to the pier as decedents did. Testimony of fisherman Harold Matzen ("Matzen") that decedents were "taking their lives in their hands" by so doing (testimony confirmed in substance, though not in specific language, by all other persons who were on the river that day and testified) conforms to what common sense would have told any reasonable person and, unfortunately, to what in fact transpired.

19. There is evidence (primarily by comparison to photographs taken May 28, 1980, a date stipulated to have had similar water conditions to, and the same gate settings as, those on the date of the accident) that on the date of the accident the breakline near Pier 6 was upstream of the piernose and the water conditions were relatively calm. Kenneth Settle of the Coast Guard Auxiliary testified that such conditions would not indicate danger to the average common-sense boater. There was also however testimony from various persons actually present the evening of the accident as to "boils" (surface turbulence) existing 10–15 feet or more *downstream* of the piernose, so that decedents' boat would have been directly within that turbulence because it was tied to the bullnose by a rope about that length, and because decedents regularly

moved closer into the dam by pulling the rope in (see Finding 26). Other testimony of several fishermen actually present that evening placed decedents' boat in the "boils."[5] Surface turbulence is necessarily a matter of degree, and moreover the presence of subsurface turbulence is not necessarily apparent to the average boater. For those very reasons, and because of the grave risks inherent in approaching too near a dam, adherence to the prohibitions established by defendants—intended to give a substantial margin of safety—is obligatory. Decedents were negligent as a matter of fact as well as law by flouting those prohibitions and placing themselves in a position of extreme peril—the maximum peril occasioned by (a) their positioning themselves in the greatest possible proximity to the roller gate and (b) their lack of ability to ride out any turbulent water conditions because of having tied their boat to the piernose, a statutory object. Plaintiffs' sign expert Dr. Caskey admitted that if turbulence were observable on the surface (which most of the fishermen present on the date of the accident testified was the case where decedents were tied up), no sign would be required to warn of the natural condition evidencing danger.

20. Plaintiffs contend that decedents' death was due to Gate 6 having been opened shortly before 7:40 p.m. by one of the two lockmen, Hebeler or Zipse, thus causing a surge of water that capsized decedents' boat, threw decedents into the water and drowned them. That contention would necessarily involve both Hebeler and Zipse in at least criminal negligence, falsification of official records by failure to record the change in gate setting (as the lockmen are required to do each time such a setting is changed)[6] and perjury during the trial.

---

**5.** Because the baffle blocks are designed to dissipate the water energy in various directions, and because the piers themselves affect the flow of the water, surface turbulence and the "breakline" do not extend the same distance downstream from the gates at all points. Rough water may be encountered at varying distances from the dam at various points.

**6.** In the log required to be maintained by the lockmen the gate settings are shown for each gate as of every hour (with a place for entries of the times any changes are made). Authority for any changes comes by radio from the hydraulic section in the Corps' Rock Island District Office, with the lockmen also instructed as to changing the settings if the pools rise or fall.

Plaintiffs point to the following as evidence to support their contention:

(a) There is a Sylsun Graph and Stephens Recorder apparatus that accurately and continuously measures and records the water level and flow in the "tail" area downstream from the dam. Its measuring apparatus is located in a protected well on the intermediate wall downstream from the dam. It recorded a rise in the water level about 7:40 p.m. July 22, and it reflected a substantially greater drop in water level after 8:30 p.m. (the latter change concurs with the acknowledged closing of Gate 6 and adjoining gates by Hebeler at that time, after the accident had been reported and Hebeler promptly went out onto the dam to close Gate 6). Both the testimony of William Koellner, the Corps' Chief of the Regulations Section (Hydraulics Branch) and the recorded change at 8:30 p.m. confirm that an increase in the gate opening of a moderate amount (one foot, from two feet to three feet) would cause a much larger increase (perhaps tenfold) than that shown at the 7:40 p.m. time. Moreover it may be noted that the 7:40 p.m. rise in water level occurred during a period when the vessel *Gateway* and her barge tow were being locked downstream through the lock (a subject discussed below in greater detail); and the recorder had also shown a smaller rise in the water level (even though no change in gate settings was made) when a downstream lockage occurred involving a smaller recreational vessel at about 6:10 p.m. the same evening.

Every change and the time of change must be noted on the report. On the date of the accident the only recorded changes in settings during the Zipse-Hebeler 4 p.m. to midnight shift were at 8:35 p.m., when the roller gates were closed (a zero setting) after the accident was reported and decedents' boat was seen tumbling in the boils at the base of Gate 6, and at 10:20 p.m., when the settings were returned to 2 feet (their original level) after the boat had been retrieved and the search for decedents proved unsuccessful.

7.  Plaintiffs ingeniously seek to have one such instance do double duty. Hebeler initially did not recall the lockage referred to in Finding 21(a), then (after his recollection was refreshed

(b) One of the fishermen, Matzen, testified he saw one of the decedents in the water some distance downstream from the dam after the accident, atop what he described as a wave or surge of water going downstream. That testimony was contradicted however by every other fisherman who testified. None of the other witnesses observed any such phenomenon, and the Court does not credit Matzen's sole testimony in that respect.

(c) Plaintiffs seek to draw adverse inferences from Hebeler's and Zipse's lack of recollection of details on the stand [7] and their reported nervousness when the accident was first reported to them on the evening it occurred. Having observed those witnesses, the Court finds their testimony credible and their nervousness on being called from their work in the lockhouse and told of one or more reported drownings totally understandable. This Court does not conclude that those matters indicate culpability on the part of either or both lockmen, as plaintiffs claim.

21.  Plaintiffs rely for their contention primarily on the 7:40 p.m. rise in water level reflected by the recorder mechanism. Their argument in that respect does not bear analysis:

(a) Had that change in water level been (as plaintiffs claim) the result of a change in the Gate 6 setting, it would necessarily have involved Hebeler or Zipse going out on top of the dam to the

by the Register of Vessel Traffic) testified to its occurrence. Plaintiffs now attempt to argue that the vessel *Gateway* was a fiction and no locking actually took place, essaying to impeach still another contemporaneously maintained official record. This Court does not credit plaintiffs' argument, but finds (a) that the *Gateway* locking took place at the time specified in Finding 21(a) and (b) that Hebeler's credibility was not rendered suspect by the episode. All of us know that the degrees of nervousness exhibited on the stand by witnesses, and the presence or absence of total recall on their part, do not necessarily correlate with whether they are telling the truth—with their basic credibility.

middle of the dam (where the gate control was located) some few minutes before 7:40 p.m. to open the gate further. However from 7:25 p.m. to 7:42 p.m. both Hebeler and Zipse were locking a vessel (the *Gateway*) and its barge tow downstream through the lock, a procedure that required their continuous presence on the lock to carry out the various steps of locking a vessel through. Such continued active presence on the lock negates plaintiffs' claim that one of the lockmen went atop the dam and changed the Gate 6 setting during the same time period.

(b) To sustain their argument plaintiffs must place the occurrence of the accident at the time of the claimed change in the Gate 6 setting and the claimed resulting surge in water level, or a few minutes before 7:40 p.m. That time placement however is substantially too early to jibe with the testimony of the numerous witnesses on the scene as to when the accident occurred. Taking all the testimony into account (see particularly Findings 24–28), including the fact that decedents had been observed fishing from their position tied to the piernose for at least a half hour before the accident, the accident could not have occurred at or before 7:40 p.m. as plaintiffs contend. From all the evidence the most probable time of occurrence was approximately 8 p.m. or shortly thereafter (a critical time difference in light of plaintiffs' contention). That later time is also more consistent with the objective fact that Doty's watch stopped at 8:17 p.m. It is therefore the Court's finding that the accident occurred at approximately 8 p.m.

(c) As stated in Finding 20(b), none of the witnesses except Matzen testified to having observed a change in the water conditions that would be consistent with a gate opening and resultant sudden surge in water flow. On the contrary, several of the fishermen present that evening testified to "boils" existing well downstream of a line parallel with the piernoses both before and after the accident.

22. These Findings now turn to the facts regarding decedents and their activities on the date of the accident. All three decedents were avid boaters and fishermen. Schlatter and Doty had owned boats for many years, and Winters had often operated his parents' boat. Schlatter had fished below Lock and Dam 13 on many prior occasions, often boating within the restricted area 100 feet downstream from the dam. Sometimes he had moored his boat to a pier of the dam and fished in the aerated white water near the structure's movable gates. Schlatter was often accompanied in that activity by his sons Gregory and Thomas and by Crabb, his friend and fellow employee. On more than one occasion Schlatter's father-in-law, Gastineau, was with him when he moored his boat to the dam, though Gastineau said they never moored in front of an open gate. Doty and Winters had previously fished and boated together on the Mississippi. Doty had not been to Lock and Dam 13 before the date of the accident. Winters had boated downstream from Lock and Dam 13 earlier in the summer of 1977, having been there with his wife the Sunday before the accident.

23. After finishing their work shifts at 4:00 to 4:30 p.m. June 22, 1977, decedents proceeded to the municipal dock and launching ramp at Fulton, Illinois, from their homes 30 miles to the east in Sterling-Rock Falls, Illinois. That launching ramp is on the east shore of the Mississippi River about three miles south of Lock and Dam 13. Decedents used Schlatter's boat described in Finding 1, equipped with the outboard motor referred to in that Finding and an electric trolling motor that was bolted to the starboard bow.

24. Charles Munson ("Munson") was fishing with his son some 150–200 feet below the dam when he was approached at about 7:00 p.m. by a blue and white bass boat with three persons in it. Munson's description of the individuals corresponds to decedents' description, and the Court finds they were in fact decedents. They had come from the direction of the dam and were trolling. Decedents discussed the

fishing conditions with Munson and decided to troll behind him for awhile. They became dissatisfied with the fishing and proceeded to the dam. At about 7:30 p.m. Munson observed the youngest of the fishing party tie a line onto a ring of the maintenance ladder at the end of the pier between Gates 6 and 7, directly below the large black and yellow restricted sign.

25. Fisherman Terry Cram ("Cram") arrived in the fishing area at about 7:30 p.m. and observed a blue and white bass boat (which the Court finds to have been decedents' boat) fishing some 500–600 feet below the dam. Cram did not see the decedents actually tied up to the pier, which confirms Munson's testimony that they did so at or after 7:30 p.m. Indeed, because Cram's time of *arrival* was at 7:30 p.m., and at or after his arrival he saw decedents' boat well downstream of the dam (obviously before they tied up and fished at the piernose for a half hour), Cram's testimony conclusively refutes plaintiffs' efforts to correlate the time of the accident with the pre-7:40 p.m. rise in water level.[8] Cram later identified the boat as the same one he later saw being slammed against Gate 6 after the accident.

26. Carolyn and Richard Trude were fishing in the "pocket" (a more sheltered area) on the Iowa side of the dam when Carolyn observed decedents' boat already tied up to Pier 6 (she did not observe the actual tying-up process, which preceded her first noticing them at the piernose).[9] While she watched they engaged in a pattern of fishing by which the young man in the boat would pull the boat into the pier by pulling in the rope, then would let it drift out. She also observed decedents were not wearing lifejackets. It was about a half hour after she first saw decedents already tied up to the pier when she heard the cries for "help!" She testified it was about 8 p.m. when she heard those cries.

27. Richard Trude, who was fishing with his wife Carolyn, also testified to having heard the cries for help about 8 p.m. Another fisherman, John Burman, had been fishing with his wife on the Iowa side of the river for several hours when he heard the cries and then saw a head downstream of the dam. Burman also testified that these events happened approximately 8 p.m.

28. Matzen was the first witness to observe any of the post-accident occurrences. As soon as he did he began rescue efforts that proved unsuccessful, then rushed to the Illinois shore, beached his boat, ran to the lockhouse and reported the drownings (see Finding 30). Matzen's testimony reviewed the timing involved in his efforts in detail, reflecting an aggregate of 20 to 25 minutes from his hearing the first cry for help until he reported the accident. As Finding 31 reflects, Zipse then quickly telephoned to report the accident and Hebeler went onto the dam. Findings 32 and 33 reflect the short additional time involved until Hebeler closed Gate 6 at 8:35–8:40 p.m. Working backward from the established time of the closing of Gate 6 as shown by the recording device, and also from the slightly earlier times of Zipse's calls to the Sheriff and Assistant Lockmaster Paul Miller (about 8:30 p.m.), once again the time of the accident is established at about 8 p.m. (and not earlier).

29. No independent witnesses saw decedents' boat capsize or decedents initially fall into the river. It would have been possible, had there been a sudden surge of water as plaintiffs claim, for that to have caused the accident. But as the preceding Findings reflect, there was nothing in the evidence to support a finding of such a surge at the time the accident occurred or, more importantly, to attribute the cause of the acci-

---

8. Some other witnesses discussed in these Findings were estimating elapsed times, while Munson's and Cram's testimony was definitive for the reason stated in the text. It is however too much for coincidence that so much evidence (a substantial part of it evoked through questioning by plaintiffs' counsel) uniformly points to an 8:00 p.m. time of occurrence. As

already stated, the Court finds the accident did occur approximately 8 p.m. (and could not in any event have occurred, as plaintiffs contend, before 7:40 or 7:45 p.m.).

9. Mrs. Trude had earlier seen decedents' boat in the open water downstream from the dam.

dent to defendants. It was also possible, as defendants contend, for decedents' boat to have swung into the pier with sufficient force to have capsized and caused decedents to be thrown into the water. Damage to the boat could have occurred in various ways and was consistent with the buffeting of the boat against Gate 6. Plaintiffs have not sustained their burden of proving the accident was attributable to defendants' conduct, and defendants are not found to have been at fault or to have caused the accident.

30. Just after the accident decedents were heard crying for help and seen floating downstream. Messrs. Trude, Matzen and Burman heard the cries for help, saw decedents' heads and their arms waving for help and immediately proceeded to try to aid decedents. Matzen testified he got to the location where he had seen the heads in a minute, made two to five unsuccessful sweeps trying to locate them and then headed for the land wall of the lock, where he beached his boat and ran to the control house to report the accident.

31. Hebeler and Zipse responded to Matzen's calls for aid. Zipse called the police and his superior Paul Miller. Hebeler went out to the dam to see whether he could provide any aid.

32. Cram testified that he had not heard any cries for help but someone came into the "pocket" (on the Iowa side) where he was fishing and told him about the accident. Cram went out to see what assistance he could give and observed decedents' boat being slammed into Gate 6. Cram then proceeded to the intermediate wall, where one of his fellow boaters climbed part way up a ladder and talked to a person (Hebeler) whom he then saw go onto the dam and close Gate 6.

33. When Hebeler went onto the dam, he saw the boat being turned over and over in the waters next to Gate 6 and closed the gate. It took approximately two minutes to close Gate 6 from its two foot opening to a zero opening. According to the automatic recording device, that gate closing occurred at approximately 8:35–8:40 p.m.

34. Decedents' boat was then retrieved from the gate bay by use of a skiff lowered from the service crane atop the dam. Next day the yellow mooring line, the trolling motor and a portion of the gunwale of the boat (all of which were still attached to the piernose, the main portion of the boat having broken away) were recovered.

35. Decedents' bodies were all recovered, without lifejackets on, three days after the accident (June 25, 1977) in the river downstream from Lock and Dam 13 on the Illinois side. Doty's watch was stopped at 8:17 p.m.

36. Decedents were not wearing lifejackets even though the boat was equipped with an ample number for each of them to have done so. Crabb testified that when he had fished with Schlatter neither of them would wear lifejackets, although when Schlatter's young sons accompanied them they would require that the sons do so. Because witnesses observed heads and arms above the water downstream from the dam after the accident, it appears likely that decedents survived the capsizing of the boat, and there is a substantial likelihood that decedents would have survived had they worn lifejackets as they should. Failure to have done so constituted additional negligence on decedents' part that was likely to have caused their drowning.

### Conclusions of Law ("Conclusions")

1. This Court has jurisdiction of the subject matter and parties to this action under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 176 n.14, 96 S.Ct. 1319, 1326 n.14, 47 L.Ed.2d 653 (1976); *Chapman v. United States*, 575 F.2d 147, 149–50 (7th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978).

2. As owner and operator of Lock and Dam 13 the Corps (and therefore the United States) has a duty to warn users of the Mississippi River that it is dangerous to approach too near to the dam. Adequacy of the warnings provided by the Corps must be judged by a standard of "reasonable-

ness": whether the Corps acted with due care under the circumstances in so warning such users.[10] *Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955).

3. Under the circumstances and for the reasons expressed in Findings 9–13, the warning signs and lights described in Finding 10 were reasonable and satisfied the Corps' duty to act with reasonable care as stated in Conclusion 2. That duty did not include, as plaintiffs claim, an obligation to impose an affirmative duty on the Corps' employees Hebeler and Zipse to maintain a continuing lookout for any unauthorized persons—like decedents—who voluntarily entered the area below Lock and Dam 13 marked "Restricted." Nor was the Corps obligated, as plaintiffs claim, to select alternate or added means of warning. *Bearce v. United States*, 614 F.2d 556, 560–61 (7th Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44, *pet'n for reh'g denied*, 449 U.S. 1026, 101 S.Ct. 595, 66 L.Ed.2d 488 (1980).

4. Taking into account all the facts stated in the Findings, the Corps and the United States acted with reasonable care as to all their conduct connected in any fashion to decedents' deaths. Because the Corps and the United States were not negligent, their conduct was not a proximate cause of decedents' deaths.

5. Ordinary standards of good seamanship (due care and general concepts of negligence) apply to recreational boaters as well as to large commercial ships. *First National Bank of Chicago v. Material Service Corp.*, 597 F.2d 1110, 1117, 1119 (7th Cir. 1979). Decedents were therefore under a duty of reasonable care when they operated their motorboat.

6. In addition to decedents' general duty of reasonable care, the United States contends that decedents were also required to follow the statutory standards of conduct prescribed by 33 U.S.C. § 351, 46 U.S.C. § 1461(d) and 33 C.F.R. § 207.300(m)–(s). In part those standards require that boaters be held liable for the "neglect of any precaution which may be required by the ordinary practice of seamen . . . " (33 U.S.C. § 351), that boaters not "use a vessel . . . in a negligent manner so as to endanger the life of any person" (46 U.S.C. § 1461(d)) and that no floating craft "shall enter any restricted area"—such as the one below Gate 6 in this case—"at any time" (33 C.F.R. § 207.300(s)). In those respects the United States asserts, and this Court concludes, that decedents violated those statutory standards of conduct by entering the restricted area below Lock and Dam 13, mooring their boat to the pier and fishing in the hazardous waters at the base of the dam.

7. It is the further contention of the United States that decedents' breaches of statutory duty referred to in Conclusion 6 require this Court to apply the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874) to this case. *First National Bank*, 597 F.2d at 1116–17. Under that rule (announced and applied in collision cases) a plaintiff guilty of breaching statutory duties must prove that the breach *could not* have been the cause of the accident or injury. If on the other hand the breach is of an ordinary duty of care, not statutorily created, the rule of *The Pennsylvania* does not apply, and the determination of contributory negligence depends on whether the plaintiff's negligence was *in fact* a cause of the accident.

8. If the rule of *The Pennsylvania* applied to this action plaintiffs could not recover, for they have not proved that the statutory breaches referred to in Conclusion 6 *could not* have been the cause of decedents' deaths. This Court need not how-

---

**10.** Danger from too near an approach of course stems from potentially hazardous waters below the dam. It is not necessary, for Corps' warnings to be reasonable and adequate, that they specifically identify the *cause* of a stated outright prohibition against coming too close to the dam. That is an obvious matter any reasonable person could be expected to know, and the absence of such identification of the reason for the prohibition cannot justify decedents' failure to comply with the numerous prohibitory signs and lights referred to in Finding 10.

**1036**

ever decide that question, because (for the reasons stated in Findings 9–12, 15, 18–19, 22–26 and 36) decedents did not act with reasonable care in entering the restricted area below Lock and Dam 13 and in their conduct thereafter, and that negligence was *in fact* the cause of the accident. *Accord* (although every case of course poses its own unique set of facts), such cases as *Jacobs v. United States*, 1979 A.M.C. 660, 666–68 (E.D.Ky.); *Cali v. United States*, No. S 75–739 PCW (E.D.Cal.1979); *Beeler v. United States*, 256 F.Supp. 771, 777 (W.D.Pa.1966); *Harris v. United States*, 154 F.Supp. 46, 51 (W.D.Ky.1957). Because the record so clearly establishes decedents' lack of due care and a direct factual nexus between their negligence and the accident causing their death, it is unnecessary to determine whether the stricter standard of *The Pennsylvania* should apply.

9. All three decedents participated in the fishing venture and had the right to reject tying up and fishing in the waters below the dam.[11] Indeed, the tying-up of the boat was at least a two-person operation. In any event, each of the decedents was independently negligent because they all should have avoided activity in the hazardous waters below Gate 6. *Rogers v. Saeger*, 247 F.2d 758, 760 (10th Cir. 1957); *Chimene v. Dow*, 104 F.Supp. 473, 477 (S.D. Tex.1952); *cf. Gele v. Chevron Co.*, 574 F.2d 243, 250 (5th Cir. 1978); *Merrill Trust Co. v. Bradford*, 507 F.2d 467, 468–70 (1st Cir. 1974).

10. Based upon decedents' failure to exercise reasonable care and the fact that the Corps *did* exercise such care, this Court concludes that the accident below Lock and Dam 13 and Gate 6 was proximately caused by the negligence of the decedents and was not proximately caused by the Corps. There is therefore no occasion to apply the doctrine of comparative negligence.

\* \* \*

It is therefore ordered that these actions be dismissed on their merits and that judgment be entered in favor of defendants.

---

11. Crabb, who had fished with Schlatter close to the dam (but not as close as decedents the evening of the accident), testified on defendants' cross-examination that had Schlatter gone in closer than was permitted Crabb would not have gone in or allowed Schlatter to take the boat into danger. On redirect Crabb testified that Schlatter was a careful, law abiding man and would have listened to that kind of reaction.