Rehearing en banc granted by
order filed 10/8/03; opinion
filed 8/1/03 is vacated

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————

No. 02-1494
(CA-00-582-3)

———————

Carrie A. McMellon, et al.,

Plaintiffs - Appellants,

versus

United States of America, et al.,

Defendants - Appellees.

———————

O R D E R

———————

The court amends its opinion filed August 1, 2003, as follows:

On page 42, line 2 of section III -- the word "it" is corrected to read "its."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CARRIE A. MCMELLON; LORI DAWN
WHITE; KATHY D. TEMPLETON; CHERI
CALL,
  *Plaintiffs-Appellants,*      No. 02-1494

  v.

UNITED STATES OF AMERICA; UNITED
STATES ARMY CORPS OF ENGINEERS,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-00-582-3)

Argued: December 5, 2002

Decided: August 1, 2003

Before NIEMEYER, WILLIAMS, and TRAXLER, Circuit Judges.

Reversed and remanded by published opinion. Judge Traxler wrote
the majority opinion, in which Judge Williams joined. Judge Nie-
meyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Jay Douglas Patton, SCHROEDER, MAUNDRELL,
BARBIERE & POWERS, Cincinnati, Ohio, for Appellants. Stephen
Robert Campbell, Trial Attorney, Torts Branch, Civil Division,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Todd M. Powers, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, for Appellants. Robert D. McCallum, Jr., Assistant Attorney General, Kasey Warner, United States Attorney, Michael L. Keller, Assistant United States Attorney, Torts Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

_____

## OPINION

TRAXLER, Circuit Judge:

Carrie A. McMellon, Lori Dawn White, Kathy D. Templeton, and Cheri Call (collectively, the "plaintiffs") filed an action against the United States under the Suits in Admiralty Act, 46 U.S.C.A. App. §§ 741-52 (West Supp. 2002), seeking recovery for injuries they suffered when they rode jet skis over the gates of the Robert C. Byrd Locks and Dam, a facility owned by the United States government and operated by the Army Corps of Engineers. The district court granted summary judgment in favor of the government, concluding that the government had no duty to provide any warnings about the dam. The plaintiffs appeal, and we reverse and remand for further proceedings.

I.

In August 1999, the plaintiffs were staying at a campground on the Ohio River near the Ohio-West Virginia border. Late one afternoon, they took two jet skis for a ride, with two of the plaintiffs riding on each of the jet skis. The plaintiffs rode upstream for a short period and then turned around and headed downstream. The plaintiffs approached what they all believed to be a bridge; when it was too late, the plaintiffs realized they were going over the gates of a dam. They dropped approximately twenty-five feet, hitting the water below and suffering significant injuries. The plaintiffs stated in their depositions that they did not see any warning signs as they approached the dam and that they could not tell until they were perhaps five feet away from the dam that there was a change in the water levels.

2

At the time of the accident, there were several warning signs on the upstream side of the dam. The plaintiffs' evidence, however, indicated that the signs were difficult to see from the river. The plaintiffs submitted affidavits from several people who regularly camp and boat in the area around the dam. The affiants stated that a warning sign on the right descending bank cannot be seen from the river because it is obscured by trees and other vegetation and that a sign located in the river on a concrete piling is not readable from a distance and is not readable from the center or right side of the river.

Until 1995, there had been buoys in place marking the entrance of the restricted area around the dam. The buoys were removed when extensive repairs were made to the dam and locks, but they were not replaced after the construction work was completed. In the summer of 2000, after the plaintiffs' accident, the Corps of Engineers placed two new warning buoys on the upstream side of the dam.

The plaintiffs' theory of the case was that the government had a duty to warn those on the river of the presence of the dam and that the signs in place were inadequate to carry out that duty. The government moved to dismiss the case, arguing that the district court lacked subject matter jurisdiction because the government's actions with regard to the dam fell within an implied "discretionary function" exception to the Suits in Admiralty Act's waiver of sovereign immunity. In the alternative, the government moved for summary judgment, arguing that it had no duty to warn about the dam, that the warnings it did provide were adequate, and that the plaintiffs' negligence was the sole cause of the accident.

The district court rejected the government's discretionary function argument and denied the government's motion to dismiss. However, the court granted summary judgment in favor of the government, concluding that the government had no duty to warn of the dam. The plaintiffs appeal.

## II.

The discretionary function issue involves jurisdictional questions of the government's waiver of sovereign immunity. Accordingly, we address that issue first.

3

The Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. §§ 2671-2680 (West 1994 & Supp. 2002), waives sovereign immunity for most tort claims asserted against the government. The FTCA includes a "discretionary function" exception, which specifically provides that the Act's waiver of sovereign immunity does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a). The plaintiffs' claims against the government, however, do not fall within the FTCA, but instead are brought pursuant to the Suits in Admiralty Act (the "SIAA"), through which the government has consented to being sued in admiralty[1] and under which the government is exposed to liability to the same extent as a private person. *See* 46 U.S.C.A. App. § 742 ("In cases where if . . . a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States. . . ."); *Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975) (explaining that under the SIAA, "the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be"). Unlike the FTCA, the SIAA does not include a discretionary function exception to the waiver of sovereign immunity. The government nonetheless contends that such an exception must be read into the SIAA.

_____

[1] Although an accident involving only jet skis would not seem to be the typical admiralty case, this case falls within the admiralty jurisdiction of the federal courts because the accident occurred on navigable waters and bears a sufficient connection to traditional maritime activities. *See, e.g.*, *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996) (concluding that admiralty jurisdiction existed over case brought by parents of child killed when the jet ski she was driving crashed into a vessel anchored in navigable waters: "Because this case involves a watercraft collision on navigable waters, it falls within admiralty's domain."); *Ayers v. United States*, 277 F.3d 821, 825-28 (6th Cir.) (concluding that admiralty jurisdiction existed over claim brought by estate of swimmer who drowned after the release of water during the process of locking vessels through a dam located on the Kentucky River), *cert. denied*, 122 S. Ct. 2330 (2002).

4

Every other circuit to consider the question has agreed with the government. *See Mid-South Holding Co. v. United States*, 225 F.3d 1201, 1204 (11th Cir. 2000); *Good v. Ohio Edison Co.*, 149 F.3d 413, 418-19 (6th Cir. 1998); *Tew v. United States*, 86 F.3d 1003, 1005 (10th Cir. 1996); *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995); *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 511 (7th Cir. 1995); *Earles v. United States*, 935 F.2d 1028, 1032 (9th Cir. 1991); *Sea-Land Serv., Inc. v. United States*, 919 F.2d 888, 891-93 (3d Cir. 1990); *Robinson v. United States (In re Joint E. & S. Dists. Asbestos Litig.)*, 891 F.2d 31, 34-35 (2d Cir. 1989); *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir. 1976). These courts have typically concluded that principles of separation of powers require that the discretionary function be read into the SIAA:

> Were we not to find a discretionary function exception to the SAA, we would subject all administrative and legislative decisions concerning the public interest in maritime matters to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries. Because such an outcome is intolerable under our constitutional system of separation of powers, we hold that a discretionary function exception is implied in the SAA.

*Tew*, 86 F.3d at 1005 (citation, internal quotation marks, and alterations omitted).

This court, however, has refused to read a discretionary function exception into the SIAA:

> [The SIAA] contains no discretionary function exception, and the Tort Claims Act contains a specific exception of claims for which the Suits in Admiralty Act provides a remedy. Thus it is clear that this action could not have been brought under the Tort Claims Act, and it is properly maintainable under the Suits in Admiralty Act, which is an effective waiver of sovereign immunity.
>
> There is no basis upon which we can import the many exceptions in the Tort Claims Act into the Suits in Admi-

5

> ralty Act, where the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be.

*Lane*, 529 F.2d at 179 (footnotes omitted). The district court, therefore, properly rejected the government's discretionary function argument.

The government, however, points us to *Faust v. South Carolina State Highway Department*, 721 F.2d 934 (4th Cir. 1983), which appears to have applied a limited form of a discretionary function exception to cases arising under the SIAA. Because *Lane* rejected, without qualification, the argument that the SIAA includes an implied discretionary function exception, we must follow *Lane. See Mentavlos v. Anderson*, 249 F.3d 301, 312 n.4 (4th Cir.) ("[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that."), *cert. denied*, 534 U.S. 952 (2001). *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991), to which the government also points, implicated the operation of our nation's air defenses, a context quite different from that presented here. As the *Tiffany* court emphasized, the significance of the military setting required the result quite independently of the discretionary function exception. *See id.* at 277 (explaining that "the discretionary function exception alone does not capture all the important aspects of this case").

The dissent contends that by following *Lane* rather than *Faust* and *Tiffany*, we are effectively overruling *Faust* and *Tiffany*, thus violating the rule that one panel cannot overrule the decision of another panel. We disagree. As Judge Luttig has noted, the

> necessary corollary of this rule is that in those instances in which a later opinion impermissibly attempts to modify an earlier opinion, the earlier opinion remains the controlling law in the circuit with respect to matters as to which the two opinions unquestionably conflict. Were it otherwise, willing panels, unconstrained by any sense of obligation to the principles of *stare decisis*, our own internal rules, or notions of collegiality, could run roughshod over prior precedent, effectively repealing a rule whose importance to both the

6

> rule of law and to the orderly operation of a court is beyond dispute.

*Harter v. Vernon*, 101 F.3d 334, 343 (4th Cir. 1996) (Luttig, J., dissenting from denial of rehearing en banc).[2] Other circuits have reached similar conclusions. *See, e.g.*, *United States v. Wheeler*, 322 F.3d 823, 828 n.1 (5th Cir. 2003) ("Where two previous holdings or lines of precedent conflict, the earlier opinion controls and is the binding precedent in the circuit." (internal alteration and quotation marks omitted)); *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court. . . . [A] later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier panel's opinion than it may disregard a ruling of the Supreme Court.").

## III.

Because this case falls within our admiralty jurisdiction, it is governed by admiralty law. *See, e.g.*, *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); *Wells v. Liddy*, 186 F.3d 505, 524 (4th Cir. 1999) ("All cases involving a tort committed on navigable water, whether brought under federal admiralty jurisdiction, in state court under the saving-to-suitors clause, or in federal court under diversity jurisdiction, are governed by admiralty law." (internal quotation marks omitted)). The plaintiffs'

---

[2] Contrary to the dissent's suggestion, this court did not apply a different standard to conflicting panel opinions in *Under Seal v. Under Seal*, 326 F.3d 479 (4th Cir. 2003). In that case, the court observed that while the Supreme Court has articulated a three-factor test for determining when an otherwise interlocutory decision is immediately appealable under the collateral order doctrine and more than one thousand panel opinions from this circuit have applied the three-factor test, fourteen panel opinions have stated that the collateral order doctrine has four factors, not three. The *Under Seal* panel concluded that the three-factor test articulated in an *en banc* opinion was controlling. *See id.* at 482-84.

claim is a straightforward negligence claim, the requirements of which under the general maritime law parallel those of land-based claims. Thus, the plaintiffs must establish that the government owed them a duty of care; that the government breached that duty; and that the government's breach of duty was a proximate cause of the plaintiffs' injuries. *See Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-2 (3d ed. 2001). The only element presently at issue in this case is that of duty.[3]

The plaintiffs contend that the common law imposes a duty to warn upon the government and that a regulation also imposes upon the government such a duty. The plaintiffs also contend that even if the government did not otherwise have a duty to warn, since the government in fact undertook to warn about the dam, it was required to use reasonable care when providing those warnings.

### A. *Duty upon Undertaking*

The plaintiffs argue that even if the government did not otherwise have a duty to warn about the dangers associated with the dam, a duty exists under the "Good Samaritan Doctrine." That is, the plaintiffs contend that once the government undertook to place some warnings, it became obligated to use due care in the exercise of that undertaking. *See Good*, 149 F.3d at 420 ("Ohio Edison argues that maritime tort liability exists by virtue of the Good Samaritan Doctrine, which makes one person liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous." (internal quotation marks omitted)). We agree with the district court, however, that the plaintiffs have failed to present any evidence of the kind of reliance necessary to support this theory.

---

[3] Because the district court concluded that the government had no such duty, the court had no occasion to consider any factual issues, such as whether the signs actually posted by the government were sufficient to fulfill any obligation it might have, whether any failing on the part of the government was a proximate cause of the plaintiffs' injuries, or whether the plaintiffs themselves were negligent.

8

The seminal "Good Samaritan" case in the admiralty context is *Indian Towing Co. v. United States*, 350 U.S. 61 (1955). In *Indian Towing*, the Coast Guard undertook to operate a lighthouse that it was statutorily authorized, but not required, to operate. The existence of the lighthouse was noted on various navigational charts. The Coast Guard negligently maintained the lighthouse, the light was extinguished, and a ship ran aground. The Supreme Court concluded that the Coast Guard's negligence in maintaining the lighthouse did not fall within the discretionary function exception to the Federal Tort Claims Act.[4] When reaching this conclusion, the Court stated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and *engendered reliance* on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Id.* at 69 (emphasis added).

---

[4] When *Indian Towing* was decided, the SIAA waived sovereign immunity only in admiralty cases involving government vessels or government cargo. *See Miller v. United States*, 725 F.2d 1311, 1314 (11th Cir. 1984); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 143 (5th Cir. 1971). Thus, the plaintiff's claim in *Indian Towing* was not then cognizable under the SIAA. The SIAA was amended in 1960 to allow claims that could be brought in admiralty "if a private person or property were involved," 46 U.S.C.A. App. § 742, language that rendered the Act's immunity waiver applicable "not just when a government owned vessel or cargo was involved but in every situation in which, if a private person were involved, a proceeding in admiralty could be maintained." *Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975). The FTCA was also amended to exclude from its reach any claims that could be brought under the SIAA. *See* 28 U.S.C.A. § 2680(d) (excluding from the Tort Claims Act claims for which the SIAA and certain other admiralty statutes provide a remedy). Thus, claims like that raised in *Indian Towing* are now brought under the SIAA, not the FTCA.

Focusing on the "engendered reliance" language, this circuit has concluded that liability under *Indian Towing* for an undertaken duty arises if the plaintiff relied to his detriment on the governmental undertaking: "The principle laid down in *Indian Towing* requires no more than that the government not injure sailors or boaters by *inducing reliance on misleading* navigational aids. It imposes no general duty upon the government to ensure navigable waters are safe or to provide warning devices." *Faust v. South Carolina State Highway Dep't*, 721 F.2d 934, 939 (4th Cir. 1983) (emphasis added). Citing *Faust*, the district court here concluded that the plaintiffs had not relied upon or been misled by the government's warning signs, and that the government therefore had no duty under the Good Samaritan doctrine.

The plaintiffs do not argue that there is evidence suggesting that they relied upon warnings issued by the government that turned out to be wrong. Instead, they simply contend that *Indian Towing* does not require reliance on the action undertaken by the government. We disagree. This court, as evidenced by the decision in *Faust*, and other courts have consistently held that liability under *Indian Towing* is typically dependent on the plaintiff's reliance on the action undertaken by the government.[5] *See, e.g.*, *Limar Shipping, Ltd. v. United States*, 324 F.3d 1, 10-11 (1st Cir. 2003) ("[T]he general principle gleaned from *Indian Towing* is that the government must not mislead, and must not induce reliance upon a belief that it is providing something

---

[5] There is, however, an exception to the reliance requirement in cases where the person undertaking the duty increases the risk that would otherwise have existed. *See Myers v. United States*, 17 F.3d 890, 904 (6th Cir. 1994) ("These cases [including *Indian Towing*] illustrate that, except for where a government employee intermeddles in a situation and makes it worse, the good samaritan doctrine will only apply against the government in the presence of reasonable, justifiable reliance."); *Patentas v. United States*, 687 F.2d 707, 715 (3d Cir. 1982) (explaining that *Indian Towing* "makes clear that some element in addition to the undertaking itself must be proven, but consistent with *Indian Towing* that element might be an increased risk of harm"); *see also Restatement (Second) of Torts* §§ 323, 324A (1965). The plaintiffs do not contend, nor could they, that the government, by posting signs that the plaintiffs did not see, increased the risk to the plaintiffs over that which they would have faced had no signs been posted.

10

which, in fact, it is not providing." (internal quotation marks omitted)); *B&F Trawlers, Inc. v. United States*, 841 F.2d 626, 632 (5th Cir. 1988); ("In *Indian Towing* . . . an innocent party who was the intended beneficiary of the government action relied on the government to his detriment."); *Estate of Callas v. United States*, 682 F.2d 613, 623 (7th Cir. 1982) ("The government argues that even if the sign evidenced negligence, it did not engender justifiable reliance by the Callases to their detriment and, thus, there can be no liability under the rule of *Indian Towing*. It is true that some type of reliance is necessary to establish that government negligence was a cause of the injury, but we conclude that there was reliance in the instant case. . . ." (citation omitted)). The only evidence in the record establishes that the plaintiffs did not see any of the signs warning of the existence of the dam. Thus, it cannot be said that the plaintiffs relied to their detriment on or were mislead by any warnings issued by the government. We therefore agree with the district court that no duty on the part of the government arose under *Indian Towing* or the Good Samaritan doctrine. The question, then, is whether a duty arises under some other source.

### B. *Regulatory Duty*

As with land-based torts, a maritime duty of care can arise from a statute or regulation. *See Southern Nat. Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1255-56 (5th Cir. 1983); Schoenbaum, *Admiralty & Maritime Law* § 5-2 ("In admiralty the duty of care may be derived from . . . duly enacted laws, regulations, and rules . . . ."). The plaintiffs contend that 33 C.F.R. § 207.300(s) (2002) imposes upon the government a mandatory duty to post warning signs. For its part, the government contends that the regulation imposes a duty on boaters, but not itself.

The regulation states:

> (s) *Restricted areas at locks and dams*. All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas. No vessel or other floating craft shall enter any such restricted area at any time. *The limits of the restricted areas at each dam will be determined by the responsible District*

11

*Engineer and marked by signs and/or flashing red lights
installed in conspicuous and appropriate places.*

*Id.* (emphasis added). The plaintiffs contend that the underscored portion of the regulation imposes upon the government a duty to conspicuously and appropriately mark the limits of the restricted area around the dam. We agree.

There are two ways that section 207.300(s) may be read. First, the regulation could be understood to declare as "restricted" some area above and below each dam on the Ohio River, but to leave to the Corps of Engineers' discretion the determination of the size of each restricted area. Second, it is possible to read the regulation as giving the Corps of Engineers discretion as to whether any area around a dam should be restricted. Since the Corps of Engineers did in fact restrict an area around the Robert C. Byrd Locks and Dam, it is unnecessary here to decide which of the possible interpretations of the regulation is the correct one. And under either reading of the regulation, we conclude that there is a mandatory duty on the part of the government to conspicuously mark the boundaries of any area surrounding each dam it decides to restrict. *See Callas*, 682 F.2d at 623 ("[T]he warning sign did not mark the limits of the restricted area as required by the Army regulations."). While the regulation also imposes a duty on boaters to stay out of the restricted areas, we simply cannot agree that the boater's duty is the only one created by the regulation, as some courts have held. *See Pearce*, 261 F.3d at 648 (concluding that regulation 207.300(s) "creates a duty for boaters, not for the Corps"); *accord Gemp v. United States*, 684 F.2d 404, 407-08 (6th Cir. 1982)

A violation of the regulation by the government, however, can support the plaintiffs' negligence claim only if the plaintiffs are within the class of persons protected by the regulation and if the harm suffered is the type of harm the regulation was intended to prevent. *See Southern Nat. Gas Co.*, 711 F.2d at 1256; *Loehr v. Offshore Logistics, Inc.*, 691 F.2d 758, 761 (5th Cir. 1982); *see also* Schoenbaum, *Admiralty & Maritime Law* § 5-2 ("Negligence may be shown by evidence of violation of a statute or regulation. The statute or regulation must be determined to be applicable, however; the plaintiff must be included in the class of persons protected and the harm suffered must

12

be the kind that the statute or rule was designed to prevent."). We conclude that the plaintiffs satisfy these requirements.

Regulation 207.300(s) requires the government to conspicuously mark the restricted areas around the dam; nothing in the regulation specifically requires the government to post signs warning of danger. That is, the government could perhaps satisfy its obligation under regulation 207.300(s) by conspicuously posting signs reading "RESTRICTED AREA, DO NOT ENTER," rather than signs reading "DANGER, DAM AHEAD, DO NOT ENTER." Because the regulation does not specifically require the government to give express safety warnings, it could be argued that the regulation is directed at the protection of government-owned dams and locks rather than the safety of those plying the waters of the Ohio River. While the protection of government property may well be the primary purpose of regulation 207.300, we think it clear that another purpose of section 207.300(s) is to protect the safety of those nearing the dam and its hazards.

Preliminarily, we note that there are other subsections of regulation 207.300 that are more specifically aimed at protecting the government's property from damage. *See, e.g.*, 33 C.F.R. §§ 207.300(b), (n), (o), (q). Moreover, any person who damages a government lock or dam is held strictly liable for those damages. *See* 33 U.S.C.A. § 408; *United States v. American Comm. Barge Line Co.*, 988 F.2d 860, 861-62 (8th Cir. 1993). If section 207.300(s) were directed *solely* to the protection of government property, it would add little to the government's arsenal. Thus, it is logical to conclude that section 207.300(s) is directed at something in addition to the protection of the government's property.

As will be discussed in more detail below, the operation of a dam across a navigable waterway is dangerous, and restricting entry into the waters near the dam is perhaps the best way to ensure the safety of the boating public. Boaters who approach a conspicuously marked area they are prohibited from entering will pause and survey their surroundings, giving them an opportunity to recognize the dangers of the dam. In fact, the Corps of Engineers has in the past acknowledged that restricting access to the waters around certain dams is critical to protecting the safety of those on the rivers. *See Navigation Regula-*

13

*tions; McClellan-Kerr Arkansas Navigation System*, 49 Fed. Reg. 10680 (March 22, 1984) (adding various regulations, including one largely identical to section 207.300(s), and noting that the added regulations "pertain to *safety items* which are essential to protect the locks and dams *and the users*" (emphasis added)).

Therefore, while section 207.300(s) may be intended to protect the government's property, we conclude that it is, at least in part, also a safety regulation intended to protect those navigating a waterway from being injured by the perils that a dam built across a navigable waterway creates. Because the plaintiffs fall within the group of persons the regulation was intended to protect and the harm that befell them was one that the regulation was intended to prevent, the government could be held liable if it breached its duties under section 207.300(s) and that breach proximately caused the plaintiffs' injuries.[6] The district court, therefore, erred by rejecting the plaintiffs' contention that regulation 207.300(s) imposed a duty on the government.

### C.  *Duty under the General Maritime Law*

In admiralty cases, unless there is "a relevant statute, the general maritime law, as developed by the judiciary, applies." *East River S.S. Corp.*, 476 U.S. at 864. "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* (footnote omitted).

Broadly speaking, the general maritime law imposes a duty to exercise reasonable or ordinary care under the circumstances, a duty which includes the duty to warn of foreseeable dangers. *See Bubla v. Bradshaw*, 795 F.2d 349, 353 (4th Cir. 1986) ("The duty of ordinary care includes, of course, a duty to warn of harm that is reasonably foreseeable under the circumstances."); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980) ("In analyzing a maritime tort case, we rely on general principles of negligence law. The plaintiff is owed

---

[6] Whether the signs in place around the dam were sufficient to satisfy the government's duty, and whether any breach by the government caused the plaintiffs' injuries, of course, are factual issues that must be resolved through further proceedings before the district court.

14

a duty of ordinary care. A defendant's failure to warn the plaintiff does not breach that duty, however, unless the resultant harm is reasonably foreseeable. Liability for a failure to warn thus arises from foreseeability, or the knowledge that particular conduct will create danger." (citation omitted)); *see also* Schoenbaum, *Admiralty & Maritime Law* § 5-2) ("A duty of care exists when injury is foreseeable. . . .").

In our view, the duty the plaintiffs envision—a duty to warn about the dangers of a dam the government constructs across navigable waters—fits easily within this general duty rubric. To state the obvious: a dam across a navigable waterway is a dangerous thing, in much the same way that a barricade put up by the government across an interstate highway would be a dangerous thing. In fact, a dam across navigable waters is arguably more dangerous than a barricade across an interstate highway, because dams can be less visible and because water currents can make it difficult to stop a boat or steer it away from danger. In light of the nature and operation of a dam built across a navigable waterway, it is clearly foreseeable that those who approach too closely may be injured.[7] Accordingly, we believe that under the general maritime law, exercise of reasonable care in the circumstances requires the owner and operator of a dam at the very least to give adequate warnings about the existence of the dam.

Other courts have reached the same conclusion, determining in cases involving government-operated dams that the government has at a minimum some obligation to warn of such danger. *See Kohl v. United States*, 712 F.2d 286, 290 (7th Cir. 1983) (concluding that government had duty to warn of dam); *Dye v. United States*, 210 F.2d 123, 128 (6th Cir. 1954) ("Although the dam was constructed under lawful authority, a duty rested upon the operator of the dam to give

---

[7] The general dangers associated with the operation of dams across navigable waters and the foreseeability of injuries seem to be sufficiently apparent to the government as well, given the government's frequent use of pamphlets, news releases, and the like to increase the public's awareness of the dangers of dams. *See Gemp v. United States*, 684 F.2d 404, 409 (6th Cir. 1982) (Merritt, J., dissenting); *Estate of Callas*, 682 F.2d at 621 n.9; *Beeler v. United States*, 256 F. Supp. 771, 774-75 (W.D. Pa. 1966).

15

adequate warning of a dangerous condition, when existing, and the failure to do so would impose liability upon the operator."); *Doty v. United States*, 531 F. Supp. 1024, 1034 (N.D. Ill. 1982) ("As owner and operator of Lock and Dam 13 the Corps (and therefore the United States) had a duty to warn users of the Mississippi River that it is dangerous to approach too near to the dam."); *see also Pearce v. United States*, 261 F.3d 643, 650 (6th Cir. 2001) ("The district court determined that there was no negligence on the part of the Corps because, *while it had a duty to warn boaters of the dangers around the dam*, it satisfied that duty . . . . The district court's factual findings were sound and, based on those findings, its conclusion that the Corps was not negligent because *it satisfied its duty to warn of danger* was not in error." (emphasis added)); *Graves v. United States*, 872 F.2d 133, 136 (6th Cir. 1989) ("[T]he district court determined that there was no negligence on the part of the Corps *because it had met its duty to warn* of any hazards associated with the closing of the locks . . . . We believe the district court's finding of [the boater's presumed knowledge of information shown of navigational charts] coupled with the remaining warning sign *reasonably satisfies any duty to warn*." (emphasis added)).[8]

_____

[8] Contrary to the dissent's suggestion, we do not believe that this rule is inconsistent with the decision in *Magno v. Corros*, 630 F.2d 224 (4th Cir. 1980). In *Magno*, the plaintiff's decedent died when his boat crashed into a dike built and maintained by the government which was marked by a single light at the end. The district court found the government liable, concluding that the lighting of the dike undertaken by the government was inadequate. This court reversed, concluding that the government could not be held liable because it had no duty to provide additional lighting. The *Magno* court repeatedly framed the issue as whether the government was under a duty to provide *additional* lighting. *See id.* at 225 ("The government appeals from that judgment on the ground that it was under no duty *to provide additional lighting* on the dike. We agree with the government's contention . . . ." (emphasis added)); *id.* at 227 ("[A] decisive issue in this case is whether the United States was under a duty to provide *additional lighting* or some other type of marking on the dike as a warning to boaters in the area." (emphasis added)); *id.* at 228 ("Plaintiff here has presented us with no authority and has introduced no evidence that would impose upon anyone a duty to mark the dike *any more clearly* than the United States did in this case." (emphasis added)). By concluding that the government did not have a duty to provide *additional* lighting, the opinion clearly proceeds on the assumption that the government in fact had a duty to provide *some* lighting of the dike.

16

Such a duty is similar to the duties imposed by the general maritime law on private defendants responsible for obstructions in navigable waterways. *See Smith v. Burnett*, 173 U.S. 430, 433 (1899) (noting that wharfingers must exercise reasonable diligence in determining the safety of their berths, a duty which requires them to remove any dangerous obstruction in a berth "or to give due notice of its existence to vessels about to use the berths"); *Ranger Ins. Co. v. Exxon Pipeline Co.*, 760 F. Supp. 97, 98-99 (W.D. La. 1990) ("A prudent pipeline owner or operator should warn of the crossing of a pipeline. . . . Moreover, if [the defendant] maintains a pipeline above the mud line, it has a further duty to warn of this potential obstruction to navigation."); *Cumberland County Utilities Auth. v. The M/T Delbar*, 604 F. Supp. 383, 389 (D.N.J. 1985) ("The plaintiff, as owner of a structure which extends into a navigable waterway, has a duty to adequately mark such structure. Failure to do so with an appropriate warning is negligence."), *aff'd*, 930 F.2d 916 (5th Cir. 1991) (table); *see also Creppel v. Shell Oil Co.*, 738 F.2d 699, 701 (5th Cir. 1984) ("Our research . . . has revealed no precedent in which a private party's liability for damages resulting from collision of a boat with an obstruction in navigable waters was predicated on any basis other than the defendant's ownership, custody, or placement of the obstruction in the navigable waters.").

And while it is not dispositive on the question of the existence of a duty under the general maritime law, we also believe the same duty would arise under common law principles. As noted above, land-based common law principles are often incorporated into the general maritime law. *See, e.g.*, *East River S.S. Corp.*, 476 U.S. at 864 (explaining that "the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules").

In tort actions, courts frequently look to the *Restatement (Second) of Torts* as a source of general common law principles that should be incorporated into the general maritime law. *See Wells*, 186 F.3d at 525 (noting that because "there is no well-developed body of general maritime law of defamation . . ., the general maritime law may be supplemented by either state law or more general common law principles," and determining that "the common law as compiled in the Restatement (Second) of Torts should control our evaluation of

17

Wells's claim of shipboard defamation"); *see also Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 841 (9th Cir. 2002); *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992). We agree with the plaintiffs that, under the principles set forth in the *Restatement*, the government would have a duty to warn about the existence of the dam.[9]

Section 343 of the *Restatement* provides that:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

*Restatement (Second) of Torts* § 343 (1965); *see also Stone v. York Haven Power Co.*, 749 A.2d 452, 457 (Pa. 2000) ("[A]ppellants have

---

[9] The government has fully responded to all of the plaintiffs' appellate arguments, but the government notes in passing that the plaintiffs did not argue below that a duty to warn arises under the common law and that they should be precluded from making that argument on appeal. *See* Brief of Appellee at 16, n.6. Nothing in the Joint Appendix reveals the precise arguments raised below. However, even if the plaintiffs did not mention the *Restatement* or other sources of land-based common law to the district court, we would not be precluded from looking to those sources for support for our determination that a duty to warn exists under the general maritime law, a body of law that often looks to the common law for guidance. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

18

a duty to maintain the dam in a safe condition and are subject to suit for any harm caused by their negligent failure to do so or to warn of dangers posed by that improvement."). This section sets forth essentially the same duty that we have described above. Under section 343, the government, as owner of the dam, has a duty to warn about its existence because members of the public, absent some warnings, may not discover that a dam is there until it is too late.

As the language of this section makes clear, section 343 reflects the common-law duty owed to invitees; the *Restatement* sets forth different standards to be applied when licensees or trespassers are involved. The government notes that the plaintiffs entered into the restricted area where boats are prohibited, and the government contends that to the extent any common law duties are relevant to this case, the plaintiffs would be considered trespassers to whom it owed no duty.

In *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959), a case involving a claim against a shipowner by a plaintiff who had been onboard to pay a social call on a member of the crew, the Supreme Court concluded that making such distinctions based on the status of the plaintiff "would be foreign to [admiralty law's] traditions of simplicity and practicality." *Id.* at 631. The Court therefore concluded that, regardless of whether the plaintiff would be treated as an invitee or licensee under land-based negligence principles, "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Id.* at 632. This court has read the *Kermarec* court's rejection of the common-law invitee, licensee, and trespasser labels as a rejection of the labels in *all* admiralty claims, not just claims against shipowners. *See Bubla*, 795 F.2d at 353 n.2 ("*Kermarec*, though considering specifically the duty of a shipowner, broadly abolished such distinctions for those properly within admiralty . . . ."). Thus, we find unavailing the government's efforts to characterize the plaintiffs as trespassers so as to reduce the duty of care owed to the plaintiffs by the government.

Without regard to the status that might be accorded the plaintiffs under land-based common law principles, we believe that, of the various statements of a landowner's duty set forth in the *Restatement*, the standard set forth in section 343 is the most consistent with the gen-

19

eral maritime law's demand for the exercise of reasonable care under the circumstances. *Cf. Gemp v. United States*, 684 F.2d 404, 407 (6th Cir. 1982) (concluding that section 343A provides "useful guidance" on the question of whether the government had a duty to warn about the dangers associated with a dam); *Harris v. Reederei*, 657 F.2d 53, 54-55 (4th Cir. 1981) (per curiam) (finding section 343A to be relevant when determining scope of shipowner's duty to employees of a stevedore). We therefore conclude that land-based common-law principles as reflected in the *Restatement* support our conclusion that the government has a duty to warn about a dam it operates.

The government insists, however, that the dam was open and obvious and that it therefore had no duty to warn. We have no quarrel with the broad proposition that there normally is no duty under the general maritime law to warn of an open and obvious danger. *See, e.g.*, *Gemp*, 684 F.2d at 406-08; *Farrell v. United States*, 167 F.2d 781, 783 (2d Cir. 1948); *Little v. United States*, 290 F. Supp. 581, 584 (E.D. La. 1968). But we cannot assume that every dam is open and obvious. For example, some dams and similar structures are constructed to be below the water line, with little if any structure extending above the water, *see, e.g.*, *Theriot v. United States*, 245 F.3d 388, 393 (5th Cir. 1998) (underwater sill); *Pagnotti v. Lancaster Township*, 751 A.2d 1226, 1227-28 (Pa. Commw. Ct. 2000) (low-head dam), and a dam located in a bend of a river may not be visible until it is too late. Thus, whether a dam is sufficiently open and obvious so as to relieve the government of any obligation to warn will normally be a question of fact dependent upon the particular circumstances of each case. This point is illustrated by *Gemp v. United States*, 684 F.2d 404 (6th Cir. 1982), a case upon which the government relies.

In *Gemp*, two men were fishing in a "stilling bay" (the area into which water flowing over a dam through an open gate is collected) of a navigational dam across the Ohio River. Because of the nature of the dam's construction, the water in the stilling bay was typically turbulent, with "spray, foam, white water, and a vortex near the face of the dam." *Id.* at 406. The men, both of whom had previously fished in the area below the dam, secured their boat to one of the piers separating the stilling bays. The boat became unsecured, struck the pier, and sank; one of the men drowned, the other was injured. After a bench trial, the district court concluded as a matter of fact that the

20

"hazards created by the open gate were obvious to any person who ventured near the . . . [d]am." *Id.* at 406-07 (internal quotation marks omitted). Because the hazards were obvious, the district court concluded that the government had no duty to warn. The Sixth Circuit affirmed that factual determination on appeal, concluding that the finding was "amply supported by the record." *Id.* at 407.

Thus, all the court did in *Gemp* was conclude, as a factual matter in that particular case, that the hazards of the dam were open and obvious, so that the government in that case had no duty to warn. But no such factual finding has been made in this case, nor can it be said that the only inference to be drawn from the evidence is that the dam was open and obvious. For example, while the plaintiffs saw the structure of the dam before the accident, none of them recognized it for what it was—they all believed that they were about to pass under a bridge. The reasonableness of this belief is a factual issue that, along with others, must be addressed below in the first instance. Accordingly, the question of whether there was an open and obvious danger so as to relieve the government of its duty to warn is simply not before this court at this time.

The government also contends that the duty urged by the plaintiffs is inconsistent with the rule that it is not an insurer of the safety of navigable waters and that it cannot be charged with the responsibility of warning about all obstructions in navigable waters. We again have no quarrel with the government's articulation of this general rule. *See Faust*, 721 F.2d at 939 ("We are aware of no authority . . . which holds that the United States may be held liable on a common law tort theory of failure to maintain safe conditions on navigable waters which it `owns.'"); *see also Eklof Marine Corp. v. United States*, 762 F.2d 200, 202 (2d Cir. 1985) ("It has long been established that the Coast Guard has no statutory mandate to *ensure* the safety of all navigable waterways in the United States and thus it has no duty to mark all obstructions.").

Contrary to the government's contention, however, the duty at issue in this case is completely consistent with the general rule that the government is not an insurer of the safety of the navigable waters. The duty in this case springs not from the government's capacity as the "owner" of all navigable waterways, but from its capacity as the

21

owner and operator of an artificial obstruction across one particular navigable waterway. Concluding that the government has a duty under the general maritime law to warn about a dam that it built, owns, and operates is a far cry from concluding that the general maritime law requires the government to warn about all obstructions in all navigable waterways.

The Ninth Circuit reached a similar conclusion in *Sutton v. Earles*, 26 F.3d 903 (9th Cir. 1994). In that case, the court concluded that the government had a duty to warn recreational boaters about a mooring buoy placed by the government within the waters of a naval base that was open to public use. The court rejected the government's argument, based on this court's decision in *Faust*, that it had no duty to warn:

> For the *United States* to be liable in *Faust* would have required finding a general duty on the part of the United States to ensure the safety of navigable waters. In contrast, our decision imposes no *general* duty to ensure the safety of navigable waters. We merely conclude that the Navy must take reasonable precautions to warn of dangers it creates by placing obstructions within the navigable waters of its Weapons Station. Indeed, the government admits that it owed the same duty imposed upon private parties whose property abuts or includes navigable waters—a duty to exercise reasonable care. We agree with the district court that this duty includes a duty to warn those lawfully plying the Weapons Station waters of the hazard placed there by the Navy.

*Id.* at 912 (citations omitted).

We therefore conclude that the general maritime law's requirement of the exercise of reasonable care under the circumstances imposes on the government a requirement to warn about a dam that it operates across navigable waters.[10] While there may be individual cases

---

[10] We note that this duty is not a particularly burdensome one. Where the government owns and operates a dam across navigable waters, the

22

involving an open and obvious dam about which the government has no duty to warn, the open and obvious nature of the dam will generally be a factual question. Accordingly, we conclude that the district court erred in its conclusion that the government had no duty to warn of the Robert C. Byrd Locks and Dam.

### D. *Other Issues*

Because we have concluded that the government's ownership and operation of a dam across navigable waters can give rise to a duty to warn, we must briefly address the government's alternative arguments as to why the district court's decision should be affirmed.

### (i)

As noted above, the SIAA provides that "the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be." *Lane*, 529 F.2d at 179. The government contends that a private person in this situation would be absolved of liability by virtue of the "recreational use" statute in effect in West Virginia (and most other states), and that it too should be protected by the recreational use statute.[11] We disagree.

---

government already has employees in place who are familiar with the dam and the unique dangers it presents. The government can without much difficulty put to use the information it already possesses to fashion an appropriate warning system. By contrast, a duty on the government to warn of every obstruction in navigable waters would be so onerous as to approach impossibility—to carry out such a duty would require vast numbers of employees continuously searching for obstructions in the many thousands of miles of navigable inland and coastal waters.

[11] In general terms, recreational use statutes "provide incentives for property owners to allow others to use their property gratuitously by altering the duties providers owe recreational users. By redefining the duty of care, the recreational use statutes make it less likely that a property owner will be liable for damages to an injured recreational user." Terence J. Centner, *Revising State Recreational Use Statutes to Assist Private Property Owners and Providers of Outdoor Recreational Activities*, 9 Buffalo Envtl. L.J. 1, 2 (Fall 2001) (footnote omitted).

23

As noted above, maritime law is federal law. While admiralty courts may apply state law in some circumstances, state law will not be applied if its application would "frustrate national interests in having uniformity in admiralty law." *Coastal Fuels Marketing, Inc. v. Florida Express Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir. 2000); *see Wells*, 186 F.3d at 525 ("State law is said to conflict with general maritime law when it negatively impacts upon admiralty's foremost goal — uniformity."); *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981) ("A state law, even though it does not contravene an established principle of admiralty law will, nevertheless, not be applied where its adoption would impair the uniformity and simplicity which is a basic principle of the federal admiralty law, or where its application would defeat an otherwise meritorious maritime cause of action." (citations omitted)).

Although there are many similarities between the various state recreational use statutes, there are significant differences as well. For example, the West Virginia statute provides that liability may be imposed only for deliberate, willful, or malicious actions, *see* W. Va. Code Ann. §§ 19-25-2, 19-25-4 (Michie 2001), while the South Carolina statute allows liability to be imposed for gross negligence, *see* S.C. Code Ann. § 27-3-60(a) (1991). In Georgia, the statute does not apply if the plaintiff is injured in an off-limits area within an otherwise open recreational area, *see Georgia Power Co. v. McGruder*, 194 S.E.2d 440, 441 (Ga. 1972), while the statute would apply in those circumstances in Indiana, *see McCormick v. Indiana*, 673 N.E.2d 829, 834-35 (Ind. Ct. App. 1996). Thus, application of the recreational use statute of the state where a maritime accident happened to occur would lead to disparate results based only on the fortuity of geography and would frustrate the goal of developing a uniform body of maritime law. Accordingly, we conclude that state recreational use statutes cannot be applied in admiralty actions.[12]

---

[12] Although at least one district court has applied a state's recreational use statute in an admiralty case, *see Pearce*, 261 F.3d at 650 (noting but declining to consider district court's alternative conclusion that Tennessee's recreational use statute applied to shield government from claim of negligent operation of a dam), we have found no circuit court opinion applying a state recreational use statute in an admiralty case. State recreational use statutes, however, have been applied in favor of the govern-

24

(ii)

The government also contends that plaintiffs' actions were the sole cause of the accident because they failed to consult navigational charts that would have shown the existence of the dam and because they violated various navigational "Rules of the Road"[13]—for example, failing to keep a proper lookout. But again, the district court decided only the question of duty; it did not consider the questions of proximate cause and comparative negligence, which are clearly factual questions that cannot be resolved by this court in the first instance. *See Lane*, 529 F.2d at 180 ("In some circumstances, particularly when large vessels are involved, the failure to have and to use current charts may be so obviously negligent as to require a finding to that effect. Circumstances are important, however, and consideration must be given to such things as the size of the vessel, its draft, the navigator's experience, his general familiarity with the waters, and his handling of the vessel." (footnote omitted)); *see also Theriot*, 245 F.3d at 400-01 (concluding that recreational boater's failure to

---

ment in actions brought under the FTCA, including cases involving injuries caused by the government's operation of a dam. *See Henderson v. United States*, 965 F.2d 1488 (8th Cir. 1992); *Maldonado v. United States*, 893 F.2d 267 (10th Cir. 1990); *Morgan v. United States*, 709 F.2d 580 (9th Cir. 1983); *Cox v. United States*, 827 F. Supp. 378 (N.D.W. Va. 1992); *Chrisley v. United States*, 620 F. Supp. 285 (D.S.C. 1985), *aff'd* 791 F.2d 165 (4th Cir. 1986) (table); *Russell v. Tennessee Valley Auth.*, 564 F. Supp. 1043 (N.D. Ala. 1983). Because these cases were brought under the FTCA, admiralty jurisdiction did not exist. *See* 28 U.S.C.A. § 2680(d) (excluding from the Tort Claims Act claims for which the SIAA and certain other admiralty statutes provide a remedy); *Pearce*, 261 F.3d at 647 ("Claims for which a remedy is available under [SIAA] are not cognizable under [the Tort Claims Act]."). Because the FTCA requires the application of the law of the state where the challenged act or omission occurred, *see* 28 U.S.C.A. § 1346(b)(1), uniformity is obviously not a primary concern under the FTCA.

[13] Commonly referred to as the "Rules of the Road," the Inland Navigation Rules, 33 U.S.C.A. §§ 2001-73, "encompass long-standing steering and sailing rules and principles . . . [and] govern navigation on inland waters." *Turecamo Maritime, Inc. v. Weeks Dredge No. 516*, 872 F. Supp. 1215, 1229 (S.D.N.Y. 1994).

25

refer to navigational charts was simply a factor to be considered when determining whether the boater used reasonable care under the circumstances). Moreover, any negligence on the part of the plaintiffs would not bar their claims, but would only reduce the amount of any recovery. *See, e.g.*, *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939) (explaining that under "the established admiralty doctrine of comparative negligence . . ., contributory negligence, however gross, is not a bar to recovery but only mitigates damages"). Accordingly, the government's arguments as to any negligence on the part of the plaintiffs raise only factual issues that must be resolved through further proceedings after remand.

(iii)

Finally, the government suggests that even if it had a duty to warn, it satisfied that duty by accurately noting on navigational charts the existence of the dam and the extent of the restricted areas surrounding it—charts the plaintiffs admittedly did not consult. *See Gemp*, 684 F.2d at 408 (explaining that "pleasure craft operators are charged as a matter of law with knowledge of information shown on such charts"); *accord Graves v. United States*, 872 F.2d 133, 136 (6th Cir. 1989). We disagree.

Unlike the Sixth Circuit, this circuit has refused to impute to boaters knowledge of information contained in navigational charts. *See Lane*, 529 F.2d at 180. The sufficiency of the warnings actually provided by the government, including the information about the dam shown on various charts, is therefore a factual question that must be resolved on remand. Moreover, as we have already discussed, 33 C.F.R. § 207.300(s) imposed on the government a duty to conspicuously mark the limits of the restricted area around the dam; this duty to provide a physical marking cannot be satisfied through notations on various navigational charts. *See id.* (The "duty as the Coast Guard has to mark wrecks hazardous to navigation is not discharged by the publication by the Department of Commerce of a chart.").

IV.

To summarize, we conclude that 33 C.F.R. § 207.300(s) imposed on the government a mandatory duty to conspicuously mark the

26

restricted area around the Robert C. Byrd Locks and Dam. We also conclude that the requirement under the general maritime law for the exercise of ordinary care under the circumstances generally obligates the government, as the owner and operator of a dam across navigable waters, to warn about the dam.[14] While the duty may not arise in a case where the dam is open and obvious, whether the dam is sufficiently open and obvious will normally be a factual question. The district court therefore erred by concluding as a matter of law that the government owed no duty to the plaintiffs. Accordingly, we reverse the district court's order and remand for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

The four plaintiffs, riding on two jet-skis at speeds between 35 and 50 miles per hour down the center of the Ohio River, went over the Robert C. Byrd dam, plunging 20-25 feet into the water below. They sustained multiple bruises and other soft-tissue injuries. They acknowledge that they were driving down the river for recreational purposes, "goofing off waving at each other" and viewing the scenery. They explain that they went over the dam because they mistook the dam's superstructure for a bridge. They also assert that they did not see several signs warning of the dam. There were two signs — one on each side of the river approximately 4,000 feet from the dam — one stating "Restricted, No Boats Here to Dam" and the other stating "Restricted, No Boats Beyond This Sign." There was another sign on a piling in the river approximately 2,000 feet from the dam stating "Restricted, No Boats Beyond This Sign." Finally, there was a sign on the dam superstructure which simply said "DAM." Apparently, one of the signs 4,000 feet from the dam was obscured by foliage, but the other signs were visible. The four jet-skiers commenced this action against the United States under the Suits in Admiralty Act,

---

[14] We again emphasize that the question before this court is the existence *vel non* of a duty to warn on the part of the government. Thus, we do not consider whether actions that might satisfy the government's duty under regulation 207.300(s) will necessarily satisfy the duty that arises under the general maritime law.

alleging that the United States was negligent in failing adequately to warn them of the dam.

The district court, although rejecting the government's assertion of sovereign immunity, concluded nonetheless that the government had no duty "to ensure navigable waters are safe or to provide warning devices." Accordingly, it entered summary judgment in favor of the United States.

In addition to reversing the district court's decision as to the existence of a duty, the majority holds that the United States does not enjoy sovereign immunity for claims within our admiralty jurisdiction arising out of the federal government's performance of discretionary functions because the Suits in Admiralty Act does not explicitly provide for such an exception. In rejecting governmental immunity in admiralty for discretionary functions, the majority revives a conflict between this circuit and the ten other circuits that have considered this issue. With regard to the government's duties, the majority holds that the United States has a duty to the plaintiff jet-skiers, arising out of 33 C.F.R. § 207.300(s), "to conspicuously mark" the restricted area around the dam and a new general maritime law duty "to warn about the dam." In imposing these new duties on the United States, the majority transforms a regulation designed to protect government property into a safety regulation and overlooks our own circuit's precedent controlling the general maritime law issue.

Because I would reconcile our inconsistent precedents on the immunity issue in favor of the constitutionally mandated separation-of-powers principles that accord immunity to discretionary actions of the United States, I would order dismissal of the case on that ground. In any event, because I would find no basis to create new maritime duties, I would affirm the district court's judgment.

I

Based on the confusing and ambivalent state of our circuit's jurisprudence created by three conflicting decisions,[1] the district court

---

[1] *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991); *Faust v. South Carolina State Highway Dep't*, 721 F.2d 934 (4th Cir. 1983); *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975).

28

denied the United States sovereign immunity for claims within its admiralty jurisdiction based on the government's discretionary conduct. Bypassing an opportunity to correct this problem, the majority now perpetuates it, thereby placing the Fourth Circuit in conflict with the ten other circuits to have considered the issue, a fact that the majority readily acknowledges.

The fundamental presumption relating to governmental liability is that the United States enjoys sovereign immunity unless it expressly waives that immunity by clear and unambiguous language. *See*, *e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign" (internal citations omitted)). The waiver invoked by the plaintiffs in this case is the Suits in Admiralty Act, 46 U.S.C. app. §§ 741-52, the maritime counterpart to the Federal Tort Claims Act. Under the Suits in Admiralty Act, "[i]n cases where if . . . a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States." 46 U.S.C. app. § 742. Because this Act does not expressly exclude cases involving discretionary governmental functions, as does the Federal Tort Claims Act, the majority concludes that the United States has waived its immunity even for its discretionary actions. The majority never addresses, however, how this interpretation can be advanced in the face of constitutionally based separation-of-powers principles, even though it recognizes the uniformity of decisions in other circuits that apply separation-of-powers principles to recognize the government's immunity. *See ante* at 5 (citing cases from the First, Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits holding that the discretionary function exception applies to suits brought against the United States under the Suits in Admiralty Act); *see also Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1085 (D.C. Cir. 1980) (same holding). I can find no valid reason why this circuit continues with an aberrant approach that does not even acknowledge the potential applicability of these constitutional principles.

The Suits in Admiralty Act, which grants a limited waiver of the federal government's sovereign immunity, has a somewhat compli-

29

cated history, only a portion of which needs to be related here. Although originally passed in 1920, the Act in its present form is the product of a 1960 amendment enacted to address "severe jurisdictional problems facing the plaintiff with a maritime claim against the United States." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 172 (1976). Prior to the 1960 amendment, a plaintiff with a maritime-related claim against the United States could bring suit under any one of four different statutes, depending on the nature of the claim: The Suits in Admiralty Act, the Public Vessels Act, the Tucker Act, or the Federal Tort Claims Act. *Id.* at 172-75. "It was the difficulty in determining the appropriate forum for a maritime claim against the United States that moved Congress to amend the Suits in Admiralty Act in 1960." *Id.* at 175. The Supreme Court explained:

> Two amendments were designed to clarify the jurisdictional language of the Suits in Admiralty Act. First, the committee added language authorizing suits against the United States where a suit would be maintainable "if a private person or property were involved." The prior version of the Act had authorized suits against the United States only when suits would be maintainable if the "vessel" or "cargo" were privately owned, operated, or possessed, and that language had generated considerable confusion.

> Second, the committee . . . deleted the language in the jurisdictional section of the Suits in Admiralty Act requiring that a vessel be "employed as a merchant vessel."

*Id.* at 176-77. The Court went on to explain that the function of the first of these amendments was "to require that those maritime tort claims that were previously cognizable only on the law side of the district courts under the Federal Tort Claims Act now be brought on the admiralty side of the district courts under the Suits in Admiralty Act." *Id.* at 176 n.14.

This transfer of the statutory basis for the waiver of sovereign immunity for some maritime tort claims from the Federal Tort Claims Act to the Suits in Admiralty Act created the problem at the heart of the present appeal. As the Seventh Circuit explained:

30

> One of the results of the 1960 amendments was to remove maritime claims such as the one at bar [alleging Coast Guard negligence for failure to place a light at the end of a breakwater] from the coverage of the Federal Tort Claims Act (FTCA). However, when the [Suits in Admiralty Act] was amended, the exceptions to the FTCA's waiver of sovereign immunity set out in 28 U.S.C. § 2680 were not restated in the [Suits in Admiralty Act]. Thus, if the exceptions expressed in 28 U.S.C. § 2680 are not implied in suits under the [Suits in Admiralty Act], the 1960 amendments to the [Suits in Admiralty Act] will have served not only to eliminate jurisdictional difficulties but also to extend the waiver of sovereign immunity in the area of maritime law. This court must determine whether the 1960 amendments to the [Suits in Admiralty Act] were intended to eliminate the discretionary function exception to the waiver of sovereign immunity expressed in the FTCA or whether this exception should be implied into the [Suits in Admiralty Act].

*Bearce v. United States*, 614 F.2d 556, 558-59 (7th Cir. 1980).

The government argues in this case that despite the inartful transfer of the governmental waiver from the Federal Tort Claims Act to the Suits in Admiralty Act, we should apply the discretionary function exception because holding otherwise and "imposing liability upon the basis urged here would involve the court in second-guessing the basic policy decisions of the Corps [of Engineers], in violation of the doctrine of separation of powers — a doctrine that this and other circuits recognize courts must observe `even in the absence of an explicit statutory command.'" Brief for United States at 29 (quoting *Tiffany v. United States*, 931 F.2d 271, 276-77 (4th Cir. 1991) (internal quotation marks and citation omitted)). I agree with the government's observations. Moreover, our decision in *Tiffany* directly supports the government, applying in this circuit the typical formulation that has been used in each of the ten other circuits to have addressed this issue. For example, the court in *Wiggins v. United States*, 799 F.2d 962, 966 (5th Cir. 1986), stated:

> Without the implication of a discretionary functions exception in the [Suits in Admiralty Act], every decision of a gov-

31

ernment official cognizable under that Act would be subject to a second-guessing by a court on the claim that the decision was negligent. All the Courts of Appeals which have faced this disruptive and overbearing prospect, with the exception of *Lane v. United States* [decided by the Fourth Circuit], have recognized the danger and have recognized an implied discretionary function limitation in the [Suits in Admiralty Act]. And the *Lane* case has been severely limited by a later decision of the Fourth Circuit.

*See also In re Joint Eastern & Southern Dists. Asbestos Litigation*, 891 F.2d 31, 35 (2d Cir. 1989) ("Only the Fourth Circuit has failed to limit the [Suits in Admiralty Act] by the discretionary function exception. Subsequently, however, the Fourth Circuit appeared to depart from its stance, so that the Fourth Circuit is no longer on record as having held unassailably that no discretionary function exception is implied in the [Suits in Admiralty Act]" (internal quotation marks and citations omitted)).

The uniformity of the decisions in the other circuits is due in large part to the Supreme Court authority articulating the constitutional foundations of the statutory discretionary function exception in the Federal Tort Claims Act. In particular, the other circuit courts have relied on dictum from *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984). In *Varig Airlines*, the Supreme Court stated, in reviewing the legislative history of the Federal Tort Claims Act:

> It was believed that claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction; nevertheless, the specific exception was added to make clear that the Act was not to be extended into the realm of the validity of legislation or discretionary administrative action.

*Id.* at 810.

And our decisions in *Tiffany* and *Faust v. South Carolina State Highway Department*, 721 F.2d 934 (4th Cir. 1983), both acknowl-

32

edge the separation-of-powers underpinnings of the discretionary function exception. Although *Faust* was decided before *Varig Airlines*, *Tiffany* was decided later, and in *Tiffany*, we explicitly adopted the dictum from *Varig Airlines*. We stated:

> The Supreme Court has further recognized Congress' belief that "claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 810 (1984). It is plain that the discretionary function exception to tort liability serves separation of powers principles by "prevent[ing] judicial `second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814.

*Tiffany*, 931 F.2d at 276.

I would conclude now, based on the circuit precedents of *Faust* and *Tiffany*, that we should follow the lead of the Supreme Court and join every other court of appeals to have considered the issue in explicitly recognizing that "[t]he respect for separation of powers principles addressed through the discretionary function exception of the FTCA [Federal Tort Claims Act] has been carried over into suits brought under DOHSA [the Death on the High Seas Act] and SAA [the Suits in Admiralty Act]." *Tiffany*, 931 F.2d at 276.

Accordingly, I would accord the United States in this case sovereign immunity and dismiss this suit on that jurisdictional ground.[2]

---

[2] Because the majority concludes categorically that the discretionary function exception is inapplicable, it does not address whether the placement of signs marking the restricted area falls within that exception. In view of the fact that I would recognize the exception, I would address the issue and conclude that the plaintiffs' claims arise out of the government's performance of a discretionary function. *See Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) (concluding that choices regarding whether to post signs near a dam and what type of signs to post, including assessments of the "cost, feasibility of maintenance and effectiveness of various types of warnings" brought negligence action within discretionary function exception).

33

Despite our decisions in *Faust* and *Tiffany* decided in 1983 and 1991, respectively, the majority relies on our decision in *Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975), which concludes that "[t]here is no basis upon which we can import the many exceptions in the Tort Claims Act into the Suits in Admiralty Act, where the United States is to be accountable in admiralty whenever a private person, in similar circumstances, would be." *Ante* at 3-5. The rule in *Lane*, articulated without exception and without any analysis under separation-of-powers principles, stated that there simply was "no basis" to recognize a discretionary function exception that bars adjudication of claims brought under the Suits in Admiralty Act.

The approach adopted in *Lane* cannot be reconciled with our approach taken in our two later cases, *Faust* and *Tiffany*. *Lane* provided no discretionary function exception, whereas both *Faust* and *Tiffany* recognized the existence of such an exception. It must be noted that *Faust* muddied the doctrinal waters by first citing *Lane* with approval, 721 F.2d at 937, and then holding — with no explanation of how its holding could be reconciled with *Lane* — that the United States would not be subject to liability under the Suits in Admiralty Act for performance of a discretionary function, *id.* at 939. But *Tiffany* clarified matters even though it stopped short of stating that *Lane* had been overruled. The *Tiffany* ruling recognizes a discretionary function exception applicable to suits brought under the Suits in Admiralty Act.

The plaintiff in *Tiffany* was the estate of a civilian pilot who was killed when an Air Force jet unintentionally collided with the tip of his plane's wing after the Air Force jet scrambled to intercept his plane as it entered an air defense identification zone without a flight plan. The estate brought its action under the Death on the High Seas Act, 46 U.S.C. app. §§ 761-68, which provides a cause of action in admiralty for wrongful death occurring on the high seas. The plaintiff alleged that the Air Force was negligent, relying in part on alleged violations of regulations promulgated by the Air Force and the North American Air Defense Command. *Id.* at 279-82. We rejected the plaintiff's suit as nonjusticiable, stating that "[i]f we were to hold that the United States acted negligently in conducting the defense of its eastern border, we would be interjecting tort law into the realm of national security and second-guessing judgments with respect to

34

potentially hostile aircraft that are properly left to the other constituent branches of government." *Id.* at 275. Underlying this holding was our determination that "[t]he respect for separation of powers principles addressed through the discretionary function exception of the [Federal Tort Claims Act] has been carried over into suits brought under DOHSA [the Death on the High Seas Act] and SAA [the Suits in Admiralty Act]." *Id.* at 276. We explained further that "[o]ur recognition of the constitutional constraints on actions brought under those acts is not a novel phenomenon." *Id.* In support of this statement, we relied on *Faust*, where "this court refused to review a negligence claim in admiralty that challenged the Corps of Engineers' discretionary issuance of a permit." *Id.* at 276-77 (internal citation omitted). Directly addressing the tension that *Faust* and *Tiffany* created with *Lane*, we stated in *Tiffany* that "*Faust* necessarily narrowed *Lane v. United States* and recognized the existence of a discretionary function exception to the Suits in Admiralty Act in some circumstances." *Id.* at 277 n.* (internal citation omitted).

The only conclusion, I respectfully submit, that can be drawn from a review of *Lane*, *Faust*, and *Tiffany* taken together is that our precedents are inconsistent. Whereas *Lane* categorically rejected any discretionary function exception to the Suits in Admiralty Act, *Faust* appeared to apply such an exception, and *Tiffany* explicitly did so. *Faust* and *Tiffany* apparently deviated from the exceptionless rule of *Lane* by recognizing "the existence of a discretionary function exception to the Suits in Admiralty Act in some circumstances."[3]

---

[3] The majority seeks to distinguish *Tiffany* on its facts even though *Tiffany* involved a claim asserted against the United States on the basis of the waiver of sovereign immunity in the Suits in Admiralty Act. But in its attempt, the majority inaccurately observes that "the significance of the military setting required the result *quite independently* of the discretionary function exception." *Ante* 6 (emphasis added). Yet, in *Tiffany* we in fact *relied* on the discretionary function exception to conclude that the case was nonjusticiable. *See Tiffany*, 931 F.2d at 275 ("We first proceed to address the relationship between separation of powers principles and the relevant federal statutes"); *id.* at 276 ("The respect for separation of powers principles addressed through the discretionary function exception of the [Federal Tort Claims Act] has been carried over into suits brought under [the Death on the High Seas Act] and [the Suits in Admiralty Act]. Our recognition of the constitutional constraints on actions brought under those acts is not a novel phenomenon").

Notwithstanding this history, the majority asserts that we are bound by *Lane*, citing authority in support of the proposition that one panel cannot overrule another panel. *See ante* at 6-7. That rule, however, is of no help to the majority in the present case because its application of the rule to ignore later panel decisions that deviate from an earlier one amounts to a violation of the very rule it seeks to apply. In other words, the majority's application of the early exceptionless approach adopted by this court in *Lane* requires rejection of the later "some circumstances" approach adopted by this court in *Faust* and *Tiffany*, and the majority thereby violates the rule that one panel cannot overrule prior decisions of the court. By ignoring the later approach and applying instead an earlier approach that is inconsistent with the later approach, the majority, in effect, overrules two cases adopting the later approach, treating these later cases as *ultra vires* or otherwise illegitimate. But the majority cannot in this case derive from the rule against one panel overruling another the authority to treat *Faust* and *Tiffany* as *ultra vires*. The most that the majority can say is that the latter two opinions violated a prudential decisionmaking rule adopted by this court. But it does not follow that they were therefore decided beyond the power of the court. They remain court precedents.[4]

When a panel of this court decides a case, that panel decision decides the case for the circuit because the panel is given authority to make decisions for the circuit. *See* 28 U.S.C. § 46(c) (providing that "[c]ases and controversies shall be heard and determined by a court or panel of not more than three judges . . . unless a hearing or

---

[4] Observing that *Lane* "rejected, *without qualification*, the argument that the [Suits in Admiralty Act] includes an implied discretionary function exception," *ante* at 6 (emphasis added), the majority determines to reject application of both *Faust* and *Tiffany*, which recognize such an exception "*in some circumstances*." To respond to my dissent, the majority relies on an earlier dissenting opinion of our court to justify its role of determining whether panels of our court in earlier cases followed our law and then rejects those cases that it concludes did not, finding them somehow illegitimate. But this is not a role that the majority can play without violating the very rule that it employs to police other cases. Devaluation of two circuit precedents — *Faust* and *Tiffany* — that were surely decided under Article III power conferred on the panel in those cases by Congress, *see* 28 U.S.C. § 46(b), rides "roughshod" over those precedents. *See ante* at 6.

36

rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service"). It must follow that a panel has the *power* to speak for the circuit in modifying or even overruling another panel's decision. Because a panel has that power, its decision modifying or overruling another panel decision is not *ultra vires*. Such an exercise of power means simply that the second panel, expressing the law for the circuit, changed the circuit's mind on the point. Only our prudential decisionmaking rule suggests otherwise, but that rule does not go to judicial power.

While I do not suggest any retreat from our prudential decisionmaking rule that one panel cannot overrule another, because that is important to orderly decisionmaking by the circuit as a whole, I only note that the rule is not a descriptive observation about the extent of the panel's *power* to decide cases and make law for the circuit. A more precise formulation of our prudential decisionmaking rule would be that one panel ought not to overrule another panel, *not* that one panel lacks judicial power to overrule the decision of another panel. Accordingly, the majority cannot ignore that *Faust* and *Tiffany* made law that applies in this circuit.

When we conclude, as we must here, that several precedents of the circuit are inconsistent with each other, we must resolve the inconsistency by applying the most appropriate legal principles then before the court. *See Under Seal v. Under Seal*, 326 F.3d 479, 484 (4th Cir. 2003) ("[H]ere, where we confront two different rules governing the same question, we are left no option but to choose from between our differing precedents"). *But see Booth v. Maryland*, 327 F.3d 377, 382-83 (4th Cir. 2003) (declining to follow the rule applied in a later case and instead following the rule articulated in earlier cases on the ground that a panel of this circuit cannot overrule a prior panel). In resolving inconsistent precedents, the rule against one panel overruling another simply does not itself resolve what ought to be done. Further, it would make scant sense to derive from that rule a formula for deciding which of inconsistent precedents to follow based only on the respective dates of decision. Always following the earlier case would entail always overruling the later case, in violation of the rule, and would bind the court to a decision without even the opportunity to consider factors either noted for the first time in later cases or relevant currently. And always following the later case would trample on

37

whatever vitality of the earlier case may have survived. When we are confronted with ambiguities and inconsistencies in our precedents, we must, I submit, put aside chronology and instead decide substantively how to resolve the ambiguity in a manner that best comports with all of the relevant legal principles.

In our system of applying precedents, the general rule is, of course, that later opinions modify and control earlier opinions. Yet this general rule is precisely opposite of that advanced by the majority, that "the earlier opinion remains the controlling law in the circuit with respect to matters as to which the two opinions unquestionably conflict." *Ante* at 6 (quoting *Harter v. Vernon*, 101 F.3d 334, 343 (4th Cir. 1996) (Luttig, J., dissenting from denial of rehearing en banc)).

The majority adduces no binding authority in contravention of the argument from first principles which concludes that *Faust* and *Tiffany* remain court precedents that must be dealt with by application, distinction, or overruling. The majority neither purports to overrule *Faust* and *Tiffany* (for that would violate the rule that it trumpets) nor asserts that *Faust* and *Tiffany* were *ultra vires*. The majority's determination to ignore *Faust* and *Tiffany* appears to be an enforcement mechanism for the rule against one panel overruling another. Unless the majority adopts the position that later inconsistent opinions are *ultra vires*, however, it must concede that *the enforcement mechanism itself requires violation of the very rule of decision making that it is designed to enforce*. Labeling the enforcement mechanism as a "necessary corollary" does not change the reality of what application of the "corollary" accomplishes, which is the overruling of later opinions.

When we review the relevant legal principles in this case, there can be little dispute that the better approach to adopt in this case would be to recognize a discretionary function exception applicable to claims brought under the Suits in Admiralty Act. This appears to be directed by the intervening Supreme Court dictum in *Varig Airlines* and is the approach adopted by the ten other circuits to have addressed the issue, as well as two decisions in our circuit, *Faust* and *Tiffany*.

I regret that the majority has failed to take the opportunity presented in the circumstances of this case to squarely and substantively

38

address the inconsistency produced by *Lane*, *Faust*, and *Tiffany* and to bring our jurisprudence in line with the ten other circuits to have addressed the issue, as well as the dictum given by the Supreme Court in *Varig Airlines*. But it has failed to do so based on a misunderstanding, I respectfully submit, as to the nature of our prudential rule of decisionmaking that directs that one panel should not overrule another.

## II

On the issue of whether the United States has duties (1) "to conspicuously mark the restricted area" (drawn from regulation 33 C.F.R. § 207.300(s)) and (2) "to warn about the dam" (drawn by analogy from the common law relating to duties of land owners), I also dissent. Neither duty up until now has been recognized by the Supreme Court or in this circuit.

First, the majority reads more into 33 C.F.R. § 207.300(s) than the language of the regulation states or implies. That regulation provides:

> *Restricted areas at locks and dams*. All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas. No vessel or other floating craft shall enter any such restricted area at any time. The limits of the restricted areas at each dam will be determined by the responsible District Engineer and marke[d] by signs and/or flashing red lights installed in conspicuous and appropriate places.

33 C.F.R. § 207.300(s). The majority holds that this is a *safety* regulation; that the jet-skiers in this case are within the class of persons protected by the regulation; and that the harm suffered by the jet-skiers is the type of harm the regulation was intended to prevent. *Ante* at 10-11.

With due respect, the language of the regulation does not support these conclusions. "Safety" is nowhere to be found in the regulation, either expressed or implied. The regulation authorizes District Engineers to *designate* areas around locks and dams as "restricted" and to

39

*prohibit* boats from entering the area. It states nothing more than how the restricted area shall be designated and made manifest by the District Engineer. While the regulation does not state the purpose of designating the areas around locks and dams as restricted, it cannot be inferred that the purpose is to give warning of dangers. It is indeed more likely a regulation to protect the government by designating areas to keep people from government property in order to prohibit interference with government operations, or to protect government property from damage or vandalism, or to protect the government from increased risks of liability that exist in the restricted area. Whatever the purpose, however, the regulation's language does not support the conclusion that restricted areas are intended to protect the safety of the public. To read the regulation to impose a duty running from the government to the public requires reading much more into this provision than appears. Indeed, a straightforward reading would suggest that if any duty is created by the regulation at all, it would run from the public to the government, imposing on the public a duty (1) not to enter government-restricted areas, (2) not to interfere with government operations, or (3) not to damage or vandalize government property.

With respect to the new maritime duty that the majority imposes on the government to warn the public of danger from a government-owned dam in navigable waters, the majority's holding is irreconcilable with the holdings of our decisions in *Faust v. South Carolina State Highway Department*, 721 F.2d 934 (4th Cir. 1983), and *Magno v. Corros*, 630 F.2d 224 (4th Cir. 1980).

In *Faust*, we decided that the issuance of a permit to operate a ferry was an unreviewable discretionary function and therefore dismissed the case against the United States. But we also rejected any general tort theory of government liability in that case, stating that "[w]e are aware of no authority and counsel has cited none which holds that the United States may be held liable on a common law tort theory of failure to maintain safe conditions on navigable waters which it `owns'." *Faust*, 721 F.2d at 939.

The majority acknowledges this statement from *Faust*, but asserts that the duty that it imposes is consistent with *Faust* because "[t]he duty in this case springs not from the government's capacity as the

40

`owner' of all navigable waterways, but from its capacity as the owner and operator of an artificial obstruction across one particular navigable waterway." *Ante* at 21-22. This distinction is not entirely persuasive because *Faust* involved — like here — an obstruction across a navigable waterway, albeit one that was authorized by the federal government rather than erected by the federal government.

But even if this distinction of *Faust* had substance, the majority's imposition of a duty on the government as "owner and operator of an artificial obstruction across one particular navigable waterway" *directly* conflicts with *Magno*, an authority that the majority acknowledges only in passing and for the purpose of trying to distinguish it, even though it is the primary basis for our dismissal of the general tort theory of liability in the very section of *Faust* that the majority quotes.

In *Magno*, we held that the United States was not liable for failing adequately to warn about an obstruction built and maintained by the United States. 630 F.2d at 228. In that case, the plaintiff died of injuries received when the motorboat that he was operating "collided with a sheet steel dike built and maintained by the United States." *Id.* at 225. The dike was a sheet steel pile structure extending 1,100 feet in length and protruding approximately two feet above the water, which the district court found was not visible to an approaching boater. *Id.* at 226. The only marking on the dike was a blinking white light at one end. *Id.* The district court concluded that this single marking at only one end was gross negligence and held the United States responsible. *Id.* We reversed, holding that the "[p]laintiff here has presented us with no authority and has introduced no evidence that would impose upon anyone a duty to mark the dike any more clearly than the United States did in this case." *Id.* at 228.

The duty imposed by the majority in the present case is indistinguishable from the duty that we determined to be nonexistent in *Magno*. If the government had no duty to place anything more than a single blinking light at the end of an 1,100 foot steel structure that was not visible to an approaching boater, as we held in *Magno*, it would seem that the majority in this case would not be entitled to conclude that the government has a duty to supplement the multiple signs that marked the restricted area about the locks and dam on the Ohio

41

River. It is no answer to assert that "[w]hether the signs in place around the dam were sufficient to satisfy the government's duty . . . [is a] factual issue[ ] that must be resolved through further proceedings before the district court." *Ante* at 14 n.6. For as the majority recognizes, "the question before this court is the existence *vel non* of a duty to warn on the part of the government," *ante* at 27 n.14, and the holding of *Magno* in the negative was rendered as a matter of law, *see* 630 F.2d at 228 ("To find liability there must first be found a duty violated. . . . Plaintiff here has presented us with no authority and has introduced no evidence that would impose upon anyone a duty to mark the dike any more clearly than the United States did in this case. We decline to impose this even higher duty on the government. Thus, *Lane* is inapposite for it requires that a duty be found in the first instance").

## III

In sum, based on our decisions in *Faust* and *Tiffany*, I would accord the United States sovereign immunity from claims based on its discretionary actions brought under the Suits in Admiralty Act, as has been done by every other circuit to have considered the issue. And in any event, I would not find the existence of the two new duties created by the majority because 33 C.F.R. § 207.300(s) does not support the first and our decisions in *Faust* and *Magno* reject the second. Accordingly, I would affirm the judgment of the district court even in the absence of sovereign immunity.

42